## HOLT MOTOR CO. v. NICHOLSON UNIVERSAL S. S. CO.
### Civil Action No. 590.

District Court, D. Minnesota,
Fourth Division.

July 1, 1944.

Josiah E. Brill (of Brill, Maslon, Grossman & Brill), of Minneapolis, Minn., for plaintiff.

Edwin L. Strand (of Messrs. Kingman, Cross, Morley, Cant & Taylor), of Minneapolis, Minn. (S. S. Eisen, of New York City, and Hill, Hamblen, Essery & Lewis, of Detroit, Mich., of counsel), for defendant.

NORDBYE, District Judge.

Plaintiff brings this action to recover damages for breach of contract. Its business was that of dealing in automobiles at wholesale and retail, and, as a part thereof, it distributed Chrysler and Plymouth automobiles through dealers in territory generally appurtenant to Minneapolis, its principal place of business. It contends that on November 7, 1940, it advised the defendant, a common carrier by water on the Great Lakes, that it was in a position to arrange with the manufacturers of Chrysler and Plymouth cars to advance the normal production schedules of the factory manufacturing said cars so as to deliver some 500 cars to the plaintiff; that it could not arrange for the manufacture of such cars unless they could be transported by water from Detroit, Michigan, to Duluth, Minnesota, before the close of the 1940 navigation season; that transportation by water was cheaper than by rail and that, if the cars were ordered and could not be shipped by water that season, this plaintiff would be unable to sell the cars as promptly to its dealers, which would result in damage by reason of extra expenses such as the difference between the cost of transportation by rail as compared with the tariff charges by water, extra incidental expense caused by rail transportation, storage of cars in Minneapolis, and interest on the money invested. It is alleged that the defendant well knew the damages which plaintiff would suffer if it ordered the cars and if the same could not be transported by water as before stated, and that, with full knowledge of the situation, defendant promised and agreed that, if plaintiff would place its order for the 500 cars and cause them to be delivered to it promptly and before the close of the 1940 navigation season, the defendant would cause the same to be transported by water from Detroit, Michigan, to Duluth, Minnesota, at the regular tariff rates for such services. Plaintiff contends that, thereafter, relying on such promise, it ordered the 500 cars and notified defendant that it had done so; that there was delivered to the defendant after that date 125 cars out of the total 500 contemplated by the agreement and which number was transported by water as agreed, but that, on November 13, 1940, defendant notified plaintiff that, by reason of weather conditions, it had declared an embargo on any further shipments by water on the upper Great Lakes, and therefore it would not accept any more cars for shipment over its lines from Detroit, Michigan, to Duluth, Minnesota. The navigation season on Lake Superior closed for 1940 on November 26th. It is contended, therefore, that defendant thereby breached the agreement above referred to. Damages caused by such breach are alleged to be a substantial sum. If plaintiff has a right of recovery, damages in some sum have unquestionably been proven.

I. The negotiations between the parties for the shipment of the cars in question were all oral and were carried on by Walter M. Shirley, the general manager of the plaintiff company, and Fred L. Hewitt, Jr., general manager of the defendant company, on November 7, 1940. These parties had done business together for several years and plaintiff had shipped many cars by water over the defendant's lines from Detroit to Duluth. That Shirley outlined the plan of advance production for the Plymouth and Chrysler cars to Hewitt, conditioned upon obtaining water transportation from Detroit to Duluth, seems reasonably free from doubt. Moreover, it seems clear that Hewitt at least assured Shirley that he was sure, or reasonably sure, that defendant could handle the cars as suggested. According to Shirley's testimony, however, Hewitt stated in substance, after learning of the proposed arrangement with the manufacturer: "We can take those 500 cars up to November 26th. We will sail as late as midnight, November 26th, which will include your production of that day if the cars are down by that evening." According to Shirley, he (Shirley) replied: "If you are sure you can handle these cars by the 26th, that is O.K. I told him, 'We can't afford to have anything go wrong with that deal.' He (Hewitt) said they could handle them by the 26th." Later, Shirley contends that he told Hewitt he had ordered the cars and that Hewitt replied: "That is good news. We will haul the cars." Hewitt's version of the conversation is to the effect that he told Shirley that

he thought that the defendant company could handle the shipment, or that he felt reasonably sure that they could handle it. He did state, however, that he did not recall the exact conversation and therefore was not in a position to deny what Shirley might contend as to that which took place. Gwatkin, a soliciting agent for the defendant, was present during the conversation, and he testified in part as follows:

"A. Mr. Shirley asked Mr. Hewitt if he could move 500 cars, and he told him that he believed he could. * * *

"Q. Later that day you and Mr. Shirley and Mr. Gillespie had a conference or conversation with Mr. Hewitt; is that correct? A. That is correct.

"Q. I believe you testified that he, Mr. Hewitt, at that time said that he believed he could move the cars? A. That is right.

"Q. Is that the sum and substance of that later conference? A. I think Shirley mentioned that he didn't want to order the cars unless they could be moved.

"Q. And what was Mr. Hewitt's response? A. He thought he could move them.

"* * * A. The exact words he used, as I recall it, is I believe, 'I believe we can move them all right.'"

█ It should be noted that the conversation between the parties will not justify the view that the plaintiff in any way obligated itself to deliver any certain number of cars to the defendant carrier. It could not be held for breach of contract if production lagged at the factory, or if for any other reason the number of cars referred to were not available for shipment prior to the close of navigation on or about November 26th. Moreover, the good faith of any statements or assurances given by Hewitt are not questioned. There is no claim of fraud. It must be assumed that the parties knew that any agreement they made was dependent upon certain contingencies such as the weather, embargoes, etc. Furthermore, it is to be doubted that there was any intention on the part of the parties to enter into a firm agreement. Even accepting Shirley's version of that which took place, it seems reasonable to find that Hewitt merely assured him that, in his opinion, the defendant company had facilities which could handle the cars which were to be ordered. There were substantially 19 days of navigation to be reckoned with. Hewitt undoubtedly felt sure that, in that period,

the contemplated number of cars, could be moved. Presumably, he was bound to exercise reasonable diligence to carry out his assurances. But to spell out of the conversation as related by Shirley, Hewitt and Gwatkin, an unequivocal agreement to carry 500 cars from Detroit to Duluth between November 7th and 26th, seems contrary to the inherent probabilities of the situation. The nature of the agreement entered into by the parties seems to be somewhat clarified by considering the correspondence that took place between them. It was on November 13, 1940, that Hewitt addressed the following letter to Mr. Shirley:

"I wired you today as follows: Regret unable to accept future Duluth Shipments after midnight tonight due weather conditions. Letter follows.

"It is unfortunate that weather conditions have changed so rapidly and the storm of this week, as I know you can well realize, makes it impossible for the continuation of navigation into an operation extending into the latter part of November.

"I felt it necessary to wire you today in view of our conversation of last week at which time we expressed the hope that the weather would remain favorable, in which event we would run as late as possible.

"With the rather disastrous result of this recent storm, we have no alternative but to curtail our operations immediately."

On November 19th Mr. Shirley responded:

"This will acknowledge receipt of your wire and letter, which, of course, came to us as a distinct disappointment. However, if there is nothing that can be done about it, we will have to accept it.

"The weather here has taken a very decided change for the better, and I am just wondering if there is any possibility that your decision to discontinue service to Duluth may be changed."

Certainly, there is nothing in this correspondence which would substantiate plaintiff's present position that there was a contract on the part of the defendant to transport the 500 cars prior to the close of navigation. There are no additional writings between the parties which throw any further light on the question. It may be pointed out, however, that, under the written agreement between Chrysler Motor Company and the plaintiff, the former reserved the right to determine how automobiles

manufactured by it should be shipped and over what lines. It seems quite probable, therefore, that the most which should be spelled out of the conversation between Shirley and Hewitt is an opinion or belief expressed in good faith by Hewitt that the defendant company would be able to furnish facilities to haul the cars in question before the close of navigation. Undoubtedly, Shirley acted and relied on such assurance. The burden would rest on the defendant to establish due diligence in fulfilling its duties as a common carrier under the circumstances.

■ II. But if there was, from the conversation between the parties, a firm agreement and contract on the part of the defendant to carry by water from Detroit to Duluth the 500 cars between November 7th and 26th, the query then is suggested: Was such an agreement valid?

Defendant was a common carrier governed by the provisions of the Intercoastal Shipping Act of 1933, as amended in 1938, 46 U.S.C.A. § 843 et seq. It was required under that Act to publish each terminal or other charge, privilege, or facility, granted or allowed to shippers. The extending or denying of any privilege or facility except in accordance with the schedules is prohibited. It was required to render its service as a common carrier without discrimination. Concededly, every facility or privilege granted to shippers must appear in its published tariff. Otherwise, the public would not be informed as to the rules, regulations, facilities, or privileges which would govern or inure to shippers over these lines. The defendant did publish a tariff covering shipments from Detroit, Michigan, to Duluth, Minnesota. There is an utter absence of any suggestion in the tariff wherein or whereby any shipper may have guaranteed to it the right to reserve space in the defendant's boats for any designated period in the future. According to the plaintiff, under the plain import of the agreement and as a result thereof, the defendant was apparently obligated to reserve sufficient space in its boats sailing between Detroit and Duluth so that the 500 cars ordered by it would be shipped between the dates in question. Again, it may be reiterated that the cars to be thus shipped were not in existence and there was no enforcible obligation on plaintiff to make any delivery of the contemplated number. However, if delivery was made for shipment, then, according to plaintiff's version of the agreement, upon failure of the defendant to carry any of such cars, the contract would be breached and the defendant liable in damages therefor regardless of defendant's diligence. Shippers who might desire to avail themselves of the defendant's facilities as a common carrier during this period, to the extent of the shipping facilities reserved, would be required to await the pleasure of the plaintiff. Moreover, the privilege that plaintiff now seeks to enforce was apparently to be accorded to it under the published tariff. The usual and customary rates as reflected therein were to govern. It was not intended that there should be a special contract entered into between the parties outside of the published tariff. All of the usual and customary provisions of the tariff were to govern. At least, there is no contention or showing to the contrary. It must be evident, therefore, that plaintiff is seeking to obtain and enforce a privilege not granted to other shippers who do business with the defendant as a common carrier under its published tariff. The situation in principle cannot be distinguished from that ruled upon by the Supreme Court in Davis v. Cornwell, 264 U.S. 560, 44 S.Ct. 410, 68 L. Ed. 848. There, the railroad agent undertook under the published tariff to bind the railway company to make available to the shipper on a certain date cars for the loading of cattle to be transported by the common carrier in interstate commerce. Justice Brandeis expressed the following view (264 U.S. at page 561, 44 S.Ct. at page 410, 68 L.Ed. 848):

"The transportation service to be performed was that of common carrier under published tariffs, not a special service under a special contract, as in Chicago, Rock Island & Pacific R. Co. v. Maucher, 248 U.S. 359, 39 S.Ct. 108, 63 L. Ed. 294. The agent's promise that the cars would be available on the day named was introduced to establish an absolute obligation to supply the cars, not as evidence that the shipper had given due notice of the time when the cars would be needed, or as evidence that the carrier had not made reasonable efforts to supply the cars. The obligation of the common carrier implied in the tariff is to use diligence to provide, upon reasonable notice, cars for loading at the time desired. A contract to furnish cars on a day certain imposes a greater obligation than that implied in the tariff.

For, under the contract, proof of due diligence would not excuse failure to perform."

One might paraphrase the language used by the Supreme Court in that case and say that the obligation of this defendant herein as a common carrier was to use due diligence in moving plaintiff's cars between November 7th and 26th. But plaintiff seeks to impose a greater obligation, in that it seeks to establish a contract on the part of the defendant to move such cars. Such an obligation is not implied in any tariff provision promulgated by the defendant.

The plaintiff relies principally on Copper River Packing Co. v. Alaska S. S. Co., 9 Cir., 22 F.2d 12, but a reading of that case discloses a factual situation substantially different. There, the shipper entered into a special contract with a common carrier which was intended to modify and extend the privileges granted to a shipper under the published tariff. For instance, the shipper therein agreed to ship exclusively by the steamers of the defendant company, and the defendant company agreed to serve the shipper either by way of its regular designated routes or by detours from such routes. It was specifically provided in the agreement that if the canning company patronized any other carrier the contract could be terminated by the defendant company. In that the contract in Davis v. Cornwell was held to be a transportation service to be performed under the published tariffs, no good reason is suggested why the transportation herein was not likewise to be performed under defendant's published tariff. It is this very distinction which motivated the court in the Copper River Packing Company case to differentiate the situation before it from that which was determined by the Supreme Court in Davis v. Cornwell. In referring to Davis v. Cornwell, the court stated: "There the transportation service to be performed was that of a common carrier under published tariffs, and not under a special contract." 22 F.2d at page 15. It follows, therefore, that plaintiff is seeking to be placed in a more favorable position under the tariffs than that which is accorded thereby to other shippers. The result would be a discriminatory practice, and to enforce such a contract as contended for by the plaintiff would place a greater obligation on the defendant than the tariffs provide, and hence it is unenforcible. Chicago & A. R. Co. v. Kirby, 225 U.S. 155, 32 S.Ct. 648, 56 L.Ed. 1033, Ann.Cas.1914A, 501.

III. It was on November 13, 1940, as hereinbefore stated, that defendant declared its embargo, notifying plaintiff and other shippers that it would be unable to accept any future shipments for Duluth after midnight of that date. The reason for the declaring of the embargo was due to severe storms which swept the upper Great Lakes on November 11, 1940. Shipping on the upper lakes was imperiled by gales which assumed almost cyclonic proportions, and the Detroit, Michigan, papers headlined the havoc which the storm created on the Great Lakes and elsewhere in the Northwest. No one can doubt from the conditions which appeared on November 13, 1940 the apparent dangers in connection with further shipping on Lake Superior. The defendant at that time did not even know where some of its boats were on the lakes. Communications with its fleet were not to be had by reason of the storm. Other water carriers serving this area declared embargoes on further shipping on the upper Great Lakes. Chrysler Corporation had begun to route shipment of cars over defendant's lines because of the embargo declared by other water carriers. In absence, therefore, of an embargo, defendant's shipping facilities would have been swamped and it would have been deluged with proffered shipments. The good faith of the defendant in doing that which it did is not seriously questioned. It is conceded that the defendant accepted no further shipment of cars from any shipper after November 13th for Duluth, and the cars which it did move after the storm had abated were cars which had been delivered to its docks on or before that date. Of the cars so delivered at defendant's dock, 216 were delivered by the plaintiff, and these cars were carried by defendant's boats to Duluth between November 18th and 25th. Whether all of the 216 cars were of the contemplated 500, or included cars which plaintiff shipped in the usual course of its business and unrelated to the 500 cars to be shipped, is not entirely clear from the evidence. All shippers whose cars had been received on or before November 13th for shipment to Duluth were handled without discrimination. It appears that all of defendant's boats at this period were operated to full capacity. If the defendant had moved any additional cars by boat to Duluth between November 13th and 26th, it would have been required to withdraw boats from areas where no embargo had

been declared. The embargo did not affect transportation on the lower Great Lakes. It merely affected shipments to Duluth, Milwaukee, and Green Bay.

■■■ The defendant urges that the reasonableness of the embargo is an administrative question; that in order to determine its validity, extrinsic evidence must be considered and its reasonableness is necessarily a factual question. Therefore, it is alleged that the United States Maritime Commission has sole jurisdiction to determine that question and that this Court must first await a decision of that tribunal thereon. It would appear from United States Navigation Co. v. Cunard Steamship Co., 284 U.S. 474, 52 S.Ct. 247, 76 L.Ed. 408, that the present United States Maritime Commission, as successor to the Shipping Board, would have substantially the same authority to pass on administrative questions which affect the public at large, as has heretofore been vested in the Interstate Commerce Commission in its field. The court stated (284 U.S. at page 480, 52 S.Ct. at page 249, 76 L.Ed. 408):

"The Shipping Act is a comprehensive measure bearing a relation to common carriers by water substantially the same as that borne by the Interstate Commerce Act (49 U.S.C.A. § 1 et seq.) to interstate common carriers by land. When the Shipping Act was passed, the Interstate Commerce Act had been in force in its original form or in amended forms for more than a generation. Its provisions had been applied to a great variety of situations, and had been judicially construed in a large number and variety of cases. The rule had become settled that questions essentially of fact and those involving the exercise of administrative discretion, which were within the jurisdiction of the Interstate Commerce Commission, were primarily within its exclusive jurisdiction, and, with certain exceptions not applicable here, that a remedy must be sought from the Commission before the jurisdiction of the courts could be invoked. In this situation the Shipping Act was passed. In its general scope and purpose, as well as in its terms, that act closely parallels the Interstate Commerce Act; and we cannot escape the conclusion that Congress intended that the two acts, each in its own field, should have like interpretation, application and effect. It follows that the settled construction in respect of the earlier act must be applied to the later one, unless, in particular instances, there be something peculiar in the question under consideration, or dissimilarity in the terms of the act relating thereto, requiring a different conclusion."

It is the defendant's position, therefore, that the jurisdiction to determine the reasonableness of the embargo rests in the Commission, while the manner of its enforcement may be a question for this Court to determine. Pennsylvania R. Co. v. Puritan Coal Mining Co., 237 U.S. 121, 35 S.Ct. 484, 59 L.Ed. 867.

Presumably, the reasonableness of the embargo as a factual question should be determined or tested as of the time the embargo was declared. While this embargo was of short duration and did not extend beyond the navigation season of 1940, it was a practice promulgated by the carrier and, as such, it affected shippers generally. Whether it was a practice which should be sustained obviously resolves itself into a question of fact. It must not be overlooked that this embargo was not solely directed to the plaintiff; it affected all future shippers on Lake Superior during the remainder of the navigation season of 1940. Whether the embargo, therefore, produced unjust discrimination or results among shippers, whether it was fair and reasonable under the circumstances, whether it should have been continued after the storm abated, indicate factors and considerations which would seem to require the determination of a single tribunal so as to insure uniformity in its application to the public. Obviously, it is a matter of public interest and concern, and the effect of the embargo concerned the public generally. It must be recognized that decisions as to such a factual question by different tribunals might result in conflicting views or holdings which would destroy uniformity in its application. Moreover, an administrative question of this character can best be determined by a tribunal which is peculiarly constituted to pass upon such question. That the courts have long recognized the exclusive jurisdiction of the Interstate Commerce Commission to pass upon administrative questions is well established. Texas & Pacific R. Co. v. Abilene Cotton Oil Co., 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553, 9 Ann.Cas. 1075; Mitchell Coal & Coke Co. v. Pennsylvania R. Co., 230 U.S. 247, 33 S.Ct. 916, 57 L.Ed. 1472; Pennsylvania R. Co. v. International Coal Min. Co., 230 U.S. 184, 33 S.Ct. 893, 57 L.Ed. 1446, Ann.Cas.1915A, 315. See, United States v. Metropolitan

Lumber Co., D.C., 254 F. 335. It would seem reasonable to hold, therefore, that the validity of this embargo and particularly the reasonableness of its continuance after the cessation of the storm involves a question which rests exclusively within the jurisdiction of an administrative body, and not the courts. This view seems to be supported from the very evident fact that the determination of this question cannot be decided by any reference to the tariff or schedules or rules or regulations promulgated by the carrier. It is an exclusive factual question which involves extrinsic evidence. Great Northern R. Co. v. Merchants' Elevator Co., 259 U.S. 285, 42 S. Ct. 477, 66 L.Ed. 943.

■ But if it should be determined that this Court has jurisdiction to decide such an administrative question, it is the Court's view that the evidence herein fairly sustains the reasonableness of the promulgation of the embargo and its continuance until the end of the navigation season. It may be noted that it is generally recognized that an embargo notice need not be published as schedules and tariffs are promulgated. Eastern R. Co. of New Mexico v. Littlefield, 237 U.S. 140, 35 S.Ct. 489, 59 L.Ed. 878. Neither is there any prescribed form of embargo. New York Hay Exchange Ass'n v. Lehigh Valley R. Co., 29 I.C.C. 90. It is sufficient if the carrier promptly notifies the shippers who are users of its lines that it is not physically able to accept further shipments. Moreover, the right of a carrier to establish an embargo if circumstances warrant it, is sustained in Pennsylvania R. Co. v. Puritan Coal Mining Co., supra, 237 U.S. at page 133, 35 S. Ct. at page 488, 59 L.Ed. 867. The United States Shipping Board has expressly taken cognizance of the right of a water carrier to declare an embargo when conditions justify such action. In Boston Wool Trade Ass'n v. M. & M. T. Co., 1 U.S.S.B. 32, 33, the following appears: "A common carrier can declare an embargo when the circumstances warrant such action. The necessity for placing embargoes is a matter to be determined in the first instance by the carrier. On the other hand, an embargo is an emergency matter to be resorted to only when there is congestion of traffic or when it is impossible to transport the freight offered because of physical limitations of the carrier." The storm, the limited time left of the navigation season, the embargo placed by other water line carriers, and the other attendant facts and circumstances, would seem to fully justify, not only the action taken by the defendant in declaring the embargo, but also its continuance during the period in question. This for the very evident reason that the evidence establishes that it would have been physically impossible for the defendant to have carried any additional merchandise; its ships were loaded to capacity.

■ Moreover, the evidence will not justify a finding that there was any unfair enforcement of the embargo. The contrary seems clearly established. As before stated, shipments of all shippers were treated without discrimination. The defendant did not accept for shipment any cars after November 13th destined to Duluth except those which were on its docks by midnight of that day. These cars had been accepted for shipment and manifestly it was required to move them. The embargo did not affect their rights by its express terms. The defendant had already accepted such cars for shipment. However, plaintiff endeavors to establish an acceptance of the 500 cars in question by virtue of a certain provision found in defendant's tariff. It refers to Rule 50—Suspension and Restoration of Service. This reads:

"Shipments will be accepted by carriers parties to this tariff during the period from March 20th, to November 15th, of each year, for transportation on the vessels of the lines parties to this tariff. Shipments also will be accepted from the latter date until the date announced by supplements to this tariff, subject to the condition that all freight left on hand at the port of transshipment after the closing of navigation for lack of space on vessels sailing after the arrival of such freight, and all freight reaching the port of trans-shipment after the last sailing of each season of navigation will be forwarded via all-rail routes and be subject to the tariff rates applicable via such all-rail routes in effect on date of shipment from point of origin of the shipment. In such cases shipping receipts, bills of lading and way-bills must bear notation to that effect. Supplements announcing the final date upon which shipments will be accepted for transportation under this tariff and effective supplements thereto, will be filed with the United States Maritime Commission, and posted at points from which the rates apply not less than one day in advance of such date.

"Note—In applying the provisions of the preceding paragraph, the date on which final instructions for transportation via the water line are received will be considered the date of acceptance of the shipment."

Plaintiff emphasizes the note above quoted and urges that the 500 cars were accepted on November 7th because final shipping instructions were given on that date. Therefore, it reasons that defendant discriminated against it in not handling its cars because they were accepted prior to the placing of the embargo. If the quoted paragraph is pertinent to a situation where an embargo has been declared, it seems obvious that there never were any final instructions for shipping these cars. This for the very patent reason that the cars were not in existence on the day when it is alleged that final instructions for shipment were given. It is conceded that on November 7th the cars had not even been ordered and were not in the process of manufacture. Indeed, plaintiff was under no contract obligation to ship any particular number of cars, and it seems wholly inconsistent to assert that final instructions were given for the shipment of cars which were not even in existence at the time. Moreover, if and when they were manufactured, the plaintiff was under no enforcible obligation to tender for shipment any certain number of cars. In passing, it may be noted that the rates under the tariff are to be computed on the wheel base measurements of the cars to be shipped. It was not even known on November 7th the number of Chryslers or the number of Plymouths which were to be included in the contemplated 500 cars. No shipping receipts or bills of lading had ever been prepared or issued on these cars. It seems clear, therefore, that the uncontradicted facts of the situation impel the conclusion that neither under the ordinary or usual understanding of the word "acceptance" nor under the tariff provisions were the cars in question, except those actually delivered at defendant's dock prior to or on November 13, 1940, accepted for shipment.

IV. The bill of complaint seems to plead and rely exclusively on the theory of a firm agreement of affreightment which plaintiff contends was breached. The evidence as to the arrangement made on November 7th was offered in support of plaintiff's contention that there was a contract to carry these cars during the period in question. In the briefs, however, it is suggested that the arrangement between the parties at least should be held to be an agreement by a common carrier to use due diligence in moving the cars in question and that such an arrangement is enforcible and compatible with the published tariffs. However, it seems reasonably clear from the evidence that the defendant, considering all the attendant facts and circumstances, did exercise due diligence to fulfill the obligation which rested upon it growing out of the arrangements which were made between the parties on the day in question. We commence with the premise that the embargo was valid. Unless subsequent facts and conditions require a finding that it was unreasonable to continue the embargo until November 26th, it must follow that defendant did exercise due diligence. Plaintiff urges that the defendant should have resumed additional service after the storm abated in order to carry out the assurances which the defendant had made to the plaintiff with respect to its ability to move the cars before the close of navigation. It does appear that, after the storm ceased, shipments were made by boat from Detroit to Duluth on November 18th, 19th and 25th. Plaintiff reasons, therefore, that the evidence indicates that transportation by boat on Lake Superior between these ports was feasible during this period, and therefore defendant should have routed boats from the lower Great Lakes or elsewhere to the Duluth run and thus take care of the balance of plaintiff's cars which remained unshipped. But there is no evidence that a resumption of so-called normal service on Lake Superior would have moved the balance of plaintiff's cars. On the contrary, the evidence indicates that there was no regular service to Duluth. Defendant's boats did not run on schedule. In addition, it may be pointed out that the three boats which did run to Duluth after November 13th were filled to capacity. There is testimony, however, that if defendant had taken boats serving the lower Great Lakes between November 13th and 26th, and routed them on Lake Superior, it could have moved the cars in question. But attention again should be called to the fact that there was no embargo declared on shipping in the lower Great Lakes. Defendant likewise operated there as a common carrier, and its duties as such had to be fulfilled. In determining the question of due diligence on the part of the defendant as a common car-

rier, there is scant merit to plaintiff's contention that defendant was obligated to discriminate against the shippers on the lower lakes in order to fulfill its duties under the circumstances to the plaintiff as a common carrier. The reasonableness of taking care of the shippers of cars during this period to points on the lower lakes is emphasized by the apparent heavier demands on defendant's shipping facilities in that area. Certainly, there is an utter absence of any showing that defendant discriminated against the shippers on Lake Superior in favor of other shipping routes on the lower lakes. Attention may be called to the undisputed testimony that in 1940 there were 135,813 cars transported on defendant's boats on the Great Lakes destined to the following ports and allocated as follows:

| | |
|---|---|
| Buffalo | 66,683 |
| Cleveland | 50,846 |
| Duluth | 8,910 |
| Milwaukee | 6,542 |
| Green Bay | 2,832 |

These figures tend to reflect the magnitude of the shipping business to the eastern ports over defendant's lines as compared with the number of cars shipped to Duluth. Moreover, it does not appear reasonable that defendant should have chanced the uncertainties of the weather and used more boats on the Lake Superior run during this time of the year. It would have meant that the embargo would have to be lifted, and with the comparatively few days left of the shipping season and the embargoes declared by other carriers, it seems evident that defendant, as a common carrier, could not have handled the business which would have been tendered to it. Its facilities were taxed to the utmost as it was. All the boats of the defendant on the lower and upper Great Lakes during this period—November 13th to 26th—were operated to full capacity.

The storm and the embargoes of other companies tended to create the dilemma which confronted the defendant. It was a contingency which the parties could not foresee when the assurances were made to the plaintiff. It seems unfortunate that the result of the embargo should have had such an apparent adverse effect on plaintiff's plans and commitments, but, in absence of fraud or lack of good faith on the part of the defendant, and the further showing that it exercised due diligence as a common carrier in performing its duties to plaintiff under the circumstances, it must follow that the defendant should not be required to respond in damages by reason of the change in plaintiff's plans for the shipment of these cars which the embargo occasioned.

■ Reference is made by the plaintiff to the portion of the tariff designated as Rule 50—Suspension and Restoration of Service—in so far that it is indicated by that paragraph that shipments will be accepted from March 20th to November 15th of each year and that shipments will also be accepted from the latter date until the date announced by supplements to the tariff. However, it seems clear that this paragraph refers to the normal operations of the carrier and does not pertain to a situation which exists as to the service afforded by the carrier when an embargo has been declared.

V. Summarizing the foregoing, it may be stated that plaintiff cannot rely on any enforcible contract as such under the tariff provisions of this carrier, and that plaintiff's only right of action must be predicated upon the alleged failure of the defendant as a common carrier to furnish to the plaintiff as a shipper, in view of the situation disclosed and the assurances made on November 7th, the necessary boats to handle the cars in question. Due diligence on the part of the defendant as a common carrier would be a defense to such a claim. The embargo declared by the carrier is prima facie a valid and sufficient answer to such a claim for damages. It must be conceded that the conditions on November 13th fully justified the declaration of the embargo. In reality, the only factual question is whether it was continued an unreasonable length of time. The evidence fairly justifies a negative answer to that query.

It follows from the foregoing that plaintiff cannot recover either on an express contract of affreightment or on account of the carrier's alleged failure to exercise reasonable diligence to perform its duties as such. The question of damages, therefore, need not be determined.

Findings of fact and conclusions of law consistent herewith may be presented by the defendant. An exception is allowed to the plaintiff.