**CHICAGO AND NORTH WESTERN RAILWAY COMPANY, a corporation, Plaintiff,**

v.

**UNION PACKING COMPANY, a corporation, Defendant.**

**Civ. No. 71-0-392.**

United States District Court,
D. Nebraska.

Feb. 22, 1974.

Gaines, Spittler & Otis, Omaha, Neb., for plaintiffs.

White, Lipp, Simon & Powers, Omaha, Neb., for defendant.

## MEMORANDUM OPINION

SCHATZ, District Judge.

This matter is before the Court upon the filing of a complaint by the Chicago and North Western Railroad Company against the Union Packing Company seeking money damages for freight charges allegedly due and unpaid. The defendant counterclaims for property damage and cartage expenses it incurred in connection with prior shipments via the plaintiff railroad. This Court has jurisdiction of the controversy by virtue of 28 U.S.C. § 1337 and 49 U.S.C. § 1 et seq. The facts have been agreed upon by the parties and the matter has been submitted to the Court, without formal hearing, on stipulations of fact and briefs of counsel. Since the defendant does not contest its liability for the freight charges, asserting that because of its counterclaims, it is not indebted to the plaintiff in any amount, the Court finds that there is no real issue concerning the defendant's liability for the freight charges and confines its examination to the issues raised by the defendant in its counterclaims.

### I.

The defendant's first counterclaim arises out of a contract between the parties for shipment of fresh beef. Under the contract, the plaintiff railroad was to pick up the beef at the defendant's place of business, carry it to the rail lines, transport it to Chicago, and deliver it to the consignee. This last delivery service is known as "cartage." When the carloads of beef reached Chicago, the plaintiff did not perform the cartage service because of a Teamsters' strike. Due to the strike, the plaintiff declared an embargo on shipments entering Chicago, but continued to accept shipments provided the shipper arranged for its own cartage at Chicago and consigned the shipments to itself. The defendant elected to ship its beef under these conditions and, in its first counterclaim, seeks to recoup from plaintiff the cartage expenses it incurred as a result of the embargo.

An embargo has been defined as "an emergency measure placed in effect because of some disability on the part of the carrier which makes the lat-

ter unable properly to perform its duty as a common carrier. It is not promulgated for protection of the shipper or the consignee but to protect transportation generally." See Froehling Supply Co. v. United States, 194 F.2d 637, 641 (7th Cir. 1952). This is substantially the same definition given the term in Holt Motor Co. v. Nicholson Universal S.S. Co., 56 F.Supp. 585 (D.Minn.1944). Further, as stated in *Holt Motor*, it is the right of a carrier to establish an embargo if circumstances warrant it, and the right of the carrier to determine in the first instance the need of an embargo and the right to place that embargo for the proper conduct of its business are well settled. Pennsylvania Railroad Co. v. Puritan Coal Mining Co., 237 U.S. 121, 35 S.Ct. 484, 59 L.Ed. 867 (1915); Asbury v. Chesapeake & Ohio Ry. Co., 314 F.Supp. 310 (D.D.C.1970); New York Central R. R. Co. v. United States, 201 F.Supp. 958 (S.D.N.Y.1962); United States v. Metropolitan Lumber Co., 254 F. 335 (D.N.J.1918); Chamber of Commerce v. B & O Railroad Co., 45 I. C.C. 40 (1917). The merits and reasonableness of the embargo in question are not seriously contested by the defendant herein [1] and in any event, it would appear that the initial validity of an embargo and the reasonableness of its continuance involve a question which rests exclusively within the jurisdiction of an administrative body and not the Court. As stated in *Holt, supra*, 56 F.Supp. at page 592, by Judge Nordbye:

> It is an exclusive factual question which involves extrinsic evidence.

*See also* United States v. Metropolitan Lumber Co., *supra*, 254 F. at 348.

Plaintiff argues that the embargo in question absolves it from all damages resulting to shippers, including defendant, as a consequence of the plaintiff's inability to provide the cartage service. Defendant asserts that it is unjust and inequitable to permit the plaintiff railroad to collect prepaid freight charges, including cartage, for service not actually rendered. In the instant case, the embargo constitutes an amendment to the ordinary tariff during the time that the embargo remains in effect. Here, defendant elected to accept shipping conditions calling for a specific service to be performed for a specific and duly published rate with full knowledge of the limitations on the service because of the embargo. In this situation, it is well settled that the defendant shipper is not entitled to payment for damages, or recoupment, which results from such an embargo. This precise question was before the Court in *Asbury, supra*, wherein the Court held, 314 F.Supp. at page 313:

> The embargo being lawfully invoked there are no damages to be recovered.

Similar holdings were set forth in *Holt Motor, supra*, and *Froehling Supply Co., supra*.

■■ Thus, where prompt notice of the embargo is given to the shipper, and the validity of the embargo has been established, the shipper is not entitled to payment for damages, or to recoup for damages, which result from the embargo. Therefore, defendant is precluded here from recovery on its first counterclaim.

## II.

The defendant's second counterclaim arises from yet another shipment of fresh beef carried by the plaintiff for the defendant. This shipment was received by the plaintiff as the initiating carrier and was transferred at some point by the plaintiff to the Boston and Maine Railroad for delivery to the destination. Upon delivery by the Boston and Maine, the consignee rejected the beef on the grounds that it was damaged. The Boston and Maine then sold

---

[1]. At a hearing before the Interstate Commerce Commission in Midwestern Beef, Inc. v. Chicago and North Western Transportation Co., (Case No. 35520, December 19, 1972), the Commission found the embargo in question was duly promulgated and consistent with customary and lawful practices.

the beef for salvage. The proceeds of this sale, however, have not been remitted to the defendant because the Boston and Maine is in reorganization and the proceeds have been impounded by the court in which the reorganization is pending. At the time of delivery of the beef by defendant to the plaintiff, it was in an unspoiled and merchantable condition, and had a fair market value of $15,145.21. The salvage sale by the Boston and Maine produced $9,589.11. The plaintiff has offered defendant the difference between these two sums (and thereby impliedly admitted that the plaintiff is liable for this amount of damage to the beef), but the defendant has refused this amount and demands the entire $15,145.21. Thus, the real question concerning the second counterclaim is which party is to be required to assert a claim in the reorganization proceedings of the Boston and Maine Railroad.

The liability of the initiating carrier is governed by 49 U.S.C. § 20(11), sometimes referred to as the Carmack Amendment. Under this statute the initiating carrier is liable to the shipper for the full amount of any damage to the goods occurring while they are in the care of the initiating carrier, any of the connecting carriers, or the delivering carrier. The initiating carrier is then subrogated to the rights of the shipper as to the damage caused by each of the other carriers. The purpose of the Carmack Amendment is to relieve the shipper of the burden of searching out a particular negligent carrier from among the often numerous carriers handling an interstate shipment. Reider v. Thompson, 339 U.S. 113, 70 S.Ct. 499, 94 L.Ed. 698 (1950). This liability for the full amount of the damages is known as the initiating carrier's insurer liability. However, this insurer liability is not interminable. After a certain point, damage to the shipment is recoverable only from the carrier causing that damage, and not from the initiating carrier. This point is reached when the delivering carrier is no longer acting in the role of a carrier, but rather in the role of a warehouseman. In Adams Seed Co. v. Chicago Great Western R. Co., 181 Iowa 1052, 165 N.W. 367 (1917), the plaintiff brought an action against the initial carrier for the conversion of goods while in the possession of the ultimate delivering carrier. Plaintiff predicated its suit upon Section 20(11), *supra*, and contended that the defendant was liable for the acts of the delivering carrier. The Iowa Supreme Court, cognizant of the fact that such vicarious liability is not unlimited, stated that such liability under the Carmack Amendment exists only where the relationship between carrier and claimant is of a carrier status. The Court further stated that once delivery exists and the goods remain in possession of the delivering carrier, the delivering carrier then becomes a warehouseman, the carrier status ceases to exist, and the initiating carrier's liability under Section 20(11) is terminated. In this connection, the Court made the following comments at page 370 of 165 N.W.:

It follows, therefore, that upon the receipt of the goods at Philadelphia by the Philadelphia & Reading Company this Philadelphia & Reading Company was required to hold the goods for delivery to the consignee for a reasonable time. During that time the initial carrier, the Chicago Great Western, remained liable for any loss or injury to the goods while so in possession of the Philadelphia & Reading Company as delivering carrier. After a reasonable time the relationship of the Philadelphia & Reading Company to the goods as common carrier ceased. It thereafter held the goods as warehouseman only, and for any loss or injury to the goods while it remained in the possession of the Philadelphia & Reading Company the Philadelphia & Reading Company would not be liable as carrier, but only for negligence as warehouseman. Under the Carmack Act the initial carrier is not liable for the negligence of the delivering carrier after its relationship

as carrier has ceased, and its duty to the plaintiff and to the goods becomes that of warehouseman only. Or, in other words, if the transit was at an end, if the delivering carrier had ceased to have possession of the goods as carrier, and held them in another capacity, as warehouseman, then the delivering carrier was responsible only for the care and diligence which the law attached to that relation, and the loss occurring while held in that relation does not reach back and involve the initial carrier or any connecting carrier.

\* \* \* \* \* \*

It is apparent then that whatever loss occurred to the plaintiff by any act of the Philadelphia & Reading Company occurred after the Philadelphia & Reading Company had ceased to be carrier and had become a warehouseman, and cannot be charged to preceding carriers. It follows, therefore, that no liability for any negligence of the Philadelphia & Reading Company, as warehouseman, could reach back and affect the initial carrier, the Chicago Great Western Railway Company, under the Carmack Amendment. \* \* \* So it is apparent that for anything that happened in Philadelphia, after the Philadelphia & Reading Company had ceased to be carriers of the goods these defendants now involved could not be made liable.

▪ Although in the instant case there was no damage as such to the goods caused by the Boston and Maine, it is clear that the Boston and Maine (the delivering carrier) is the cause of the shipper's failure to receive the proceeds of the sale. The question then is whether this occurred while the Boston and Maine was acting as a carrier or as a warehouseman. The issue is not seriously in doubt. Although the carrier's status does not change to that of a warehouseman where anything remains to be done by it to effectuate a delivery, Keystone Motor Freight Lines v. Brannon-Signaigo Cigar Co., 115 F.2d 736 (5th Cir. 1940), where the consignee re-

fuses delivery, the status of the carrier changes at the point where a proper tender of delivery is made, General American Transp. Corp. v. Indiana Harbor Belt R. Co., 191 F.2d 865 (7th Cir. 1951), wherein the Court stated at page 870:

This argument of the plaintiff that there must be actual delivery to an ocean vessel, carried to its logical conclusion would mean that the carrier's liability could be kept in force indefinitely by the consignee by its simply failing to provide space on a ship onto which the shipment could be unloaded. This is not the law. There is considerable confusion in the language of the decisions as to just when the insurer liability of the carrier terminates but it does not endure indefinitely. *It seems clear that a tender of delivery, if refused by the consignee, would also terminate the carrier's responsibility as an insurer.* (Emphasis added.)

*See also Keystone Motor Freight Lines, supra,* wherein the Court points out that a proper tender would have reduced the delivering carrier's liability to that of a warehouseman. The contention that a proper tender of delivery cannot be made where the goods arrive in a damaged condition has been specifically rejected, Texas Instruments, Inc. v. Branch Motor Express Co., 432 F.2d 564 (1st Cir. 1970). All that is required is that the goods be presented during normal business hours and with a reasonable opportunity for the consignee to accept them. *Keystone Motor Freight Lines, supra*; Dohrmann Hotel Supply Co. v. Owl Transfer & Storage Co., 19 Wash.2d 522, 143 P.2d 441 (1943). There is no evidence in this case that the tender of delivery was not properly made.

▪ In conclusion, the Court finds that after the refusal of tender of delivery by the consignee, any loss caused by the Boston and Maine occurred in its capacity as a warehouseman. This is definitely the rule where the loss to the shipper is in the form of damage to his goods. *See* Deer Park Baking Co. v.

Cleveland and Chicago Motor Express Co., 46 Ohio Law Abst. 193, 68 N.E.2d 824 (Ohio App.1946). The Court is cited to no authority indicating an opposite result where the loss to the shipper is caused by the reorganization of the delivering carrier, nor is there any sound reason for the Court to adopt a contrary view in the absence of precedent. Therefore, in the instant case, it is the defendant shipper who must look to the Boston and Maine for the salvage proceeds and the liability of plaintiff is limited to the amount of the difference between the fair market value of the beef in question and the salvage proceeds.

Accordingly, by separate order entered this day, judgment will be entered for the plaintiff on its complaint in the amount of $24,411.02; judgment will be entered in favor of the plaintiff and against the defendant on defendant's first counterclaim; judgment will be entered in favor of the defendant on its second counterclaim in the amount of $5,556.10. Net judgment will be entered for the plaintiff in the amount of $18,854.92.