INTERSTATE COMMERCE COMMIS-
SION and Alco-Gravure, Inc.

v.

The BALTIMORE AND ANNAPOLIS
RAILROAD COMPANY and
Elmer J. Jubb.

Civ. No. B-74-786.

United States District Court,
D. Maryland,
Baltimore Division.

April 29, 1975.

Order May 12, 1975.

Daniel S. Linhardt, Interstate Commerce Commission, Washington, D. C.; Earl H. Nemser, New York City, and Francis J. Gorman, Baltimore, Md., for plaintiffs.

Joseph I. Huesman, Baltimore, Md., for defendants.

## MEMORANDUM

BLAIR, District Judge.

The Interstate Commerce Commission (ICC) instituted this civil action on July 25, 1974, seeking preliminary and permanent injunctive relief against the defendants, The Baltimore and Annapolis Railroad Company (B & A) and its President, Elmer J. Jubb. Specifically, the ICC seeks to restrain B & A from its alleged illegal abandonment of a segment of its track that runs from Clifford Junction in Baltimore City to a point approximately six miles south. Shortly after the suit was filed

a former customer of B & A, Alco-Gravure, Inc. (Alco), sought to intervene in the action pursuant to Rule 24(b) of the Federal Rules of Civil Procedure. Before a hearing on the motion for preliminary injunction, B & A moved to dismiss or, in the alternative, to stay the proceedings pending the outcome of an application now before the ICC in which it seeks permission to abandon service permanently along its entire route. The hearing was limited, however, solely to the motion for a preliminary injunction and the motion to intervene, and a decision on defendants' motion to dismiss or stay the proceedings was postponed until a hearing on the merits of the permanent injunction could be held.

Testimony and argument on ICC's motion for a preliminary injunction and Alco's motion for leave to intervene were heard August 20–22, 1974. On August 26, this court granted Alco leave to intervene, but denied the request for a preliminary injunction. *I.C.C. v. Baltimore & A. R. R.*, 64 F.R.D. 337 (D.Md.1974). Alco's complaint alleging violations by defendants of 49 U.S.C. §§ 1(18)–(20) and requesting permanent injunctive relief only was filed the same day.

On August 30, 1974, Alco filed its first amended complaint, which added a prayer for damages based upon common law principles and upon 49 U.S.C. §§ 1(4), 1(11) (1970). Defendants again filed a motion to stay the proceedings pending the outcome of the ICC abandonment proceedings. The decision on this motion was also deferred pending a hearing on the merits of the request for permanent injunctive relief.

On February 21, 1975, defendants answered the complaints of ICC and Alco, and moved to dismiss Alco's request for injunctive relief and damages. Defendants also requested a jury trial on the issue of damages. With the concurrence of counsel for all parties, the court heard testimony and argument limited solely to the merits of the permanent injunction on March 11, 1975, postponing a ruling on the defendants' motion to dismiss Alco's damage claim.

The facts as found by this court in its opinion of August 26, 1974, denying ICC's motion for a preliminary injunction are adopted for purposes of this decision, except as modified or changed.

### Findings of Fact

A. *Developments since August 1974 hearing.*

At the time of the hearing on ICC's motion for a preliminary injunction in August of 1974, there was pending before an ICC review board a decision on the exceptions taken by both parties to the initial decision of the administrative law judge concerning Alco's complaint before the ICC. The law judge had found B & A in violation of sections 1(4) and 1(18) of the Act. Based on the violation of section 1(4), he had ordered B & A to cancel the temporary embargo and take the necessary steps to restore rail service to Alco. He also ruled, however, that Alco had failed to establish a prima facie case for showing a violation of section 1(11) and that the ICC had no jurisdiction to enforce violations of section 1(18). The filing of the exceptions by both B & A and Alco stayed the effect of the initial decision.

On August 22, 1974, the ICC Review Board rendered its decision on the exceptions. It agreed with the administrative law judge as to his section 1(11) and section 1(18) rulings. However, the Board further ruled that the ICC had no jurisdiction to enforce section 1(4) of the Act. The Board therefore dismissed Alco's complaint. Subsequent to the decision of this court denying ICC's motion for a preliminary injunction, Alco petitioned the ICC for reconsideration of its earlier decision. This petition was denied on January 16, 1975. Alco has not sought judicial review of the ICC decision.

458

As to the progress of B & A's abandonment application before the ICC, a draft environmental impact statement has now been prepared and a hearing on the abandonment application was to be held April 16, 1975. A final decision by the ICC is expected to take at least six months; in addition, final resolution of B & A's abandonment request could be further delayed by subsequent judicial review. In short, a final decision on B & A's petition for abandonment is not imminent. In the meantime, no repairs to the rail line have been undertaken, and rail service to Alco's Glen Burnie plant has not been restored.

B. *Effect of cessation of service upon operation of Alco's Glen Burnie plant.*

As of June 30, 1974, Alco had incurred additional costs of $218,000 as a consequence of the loss of B & A's rail service. Since that time, this figure has risen by $42,000 to $260,000. Of this total, Alco has passed on $124,000 to various customers in the form of direct billings and absorbed $136,000. Alco's Maryland plant is thus placed at a competitive disadvantage at least as compared to its position before June of 1972 but nevertheless remains profitable and has increased its output substantially since June of 1972.

Because this court denied the ICC's motion for a preliminary injunction, Alco was required to renew its warehouse lease for 1975 at a substantial increase in rent, which is reflected in the figures noted above. However, the lease can be terminated upon thirty days' notice.

C. *Costs to restore rail service to Alco's plant.*

There are three major cost categories in determining the total expenditure required to restore service to Alco's plant: (1) 4.2 miles of trackage; (2) the bridge over the Patapsco River, including the trackwork thereon; and (3) the bridge over Old Annapolis Road.

The cost of repairs to the trackage was subject to much dispute. Defendants' experts, employees of Rhinehart Railroad Construction, Inc., estimated the costs as of June 1973 to be $187,000 plus contingencies of $37,000, for a total of $224,000, which includes $4,000 for the trackage across the Patapsco River bridge. As of September 1974, these costs had increased to $242,000, plus contingencies of $49,000, for a total of $291,000. This includes $9,800 for track work over the bridge. These figures, however, were not limited to standards for a class one railroad and would allow an operating speed of at least 25 miles per hour, 15–20 miles per hour greater than would be required. They contained no breakdown as to Agnes-related damage. The estimate also assumed new rail would have to be purchased, without considering the use of second-hand rail that B & A owns but which is not currently used.

Alco's expert, Jack D. Storm, based his estimate upon Federal Railroad Administration class one standards for operating speeds of ten miles per hour. His estimate was also broken down into damage caused by Agnes, and conditions existing before Agnes and conditions arising since. Mr. Storm estimated that the total cost of repair of trackage at 1972 prices would have been $32,000, only $700 of which was attributable to Agnes. At 1975 prices, these figures are $43,000 and $1,200 respectively. None of the figures include costs for track work over the bridge. The costs not attributable to Agnes are directly attributable to B & A's failure to expend funds necessary for routine maintenance over the years. Mr. Storm is eminently qualified as an expert in this field, and his painstaking methodology and detailed summaries render his testimony the most credible. Hence, this court finds as fact the cost figures submitted by Mr. Storm.

The only testimony concerning the cost of bridge repair was provided in

the form of expert testimony from a McLean Contracting Co. employee, Mr. G. R. Wentz, called by the defendants in both the preliminary injunction and permanent injunction hearings. As of November 1972, McLean estimated the cost of repair to be $40,000—$45,000. As of June 1973, this cost had risen to $55,000. Neither figure included the cost of design engineering, which could be expected to increase the total by approximately ten percent. As of March 1975, Mr. Wentz estimated the total cost of repair to be $100,000, which includes the consulting engineer's fee for design. None of these figures includes the cost to repair the track work over the bridge.

The November 1972 and June 1973 estimates contained no specific breakdown as to which costs were or were not attributable to Hurricane Agnes. Mr. Wentz stated that deterioration of the concrete supports took place over a period of years, but he could not state whether the failure to repair would have caused the final destruction when Agnes swept by. Given the fact that most of the cost to repair the trackage is a result of B & A's conscious policy of deferred maintenance, it is reasonable to infer that such a policy also substantially contributed to the washout of the Patapsco River bridge. Although it cannot be stated with certainty that the bridge would have been operational after Agnes had B & A not failed to perform routine maintenance on the bridge, this court finds that the cost to repair and restore service over the bridge would have been substantially less, even though the final washout was directly attributable to Agnes.

Of the $100,000 figure for March 1975, Mr. Wentz testified that $15,000 is attributable to further deterioration of the bridge since June of 1973 due to lack of maintenance; the remaining $85,000 would therefore represent repair cost attributable to Agnes and to pre-1972 deferred maintenance, adjusted to reflect 1975 prices.

Defendants' experts submitted the only testimony as to the cost of repairing the bridge over Old Annapolis Road. At 1973 prices, this figure was $3,500, and by 1975 the cost had risen to $9,000 due to inflation and further physical deterioration. None of this cost is attributable to Hurricane Agnes.

In summary, this court finds the 1972 and 1975 cost to restore service on the B & A line to the Alco plant to be as follows: In 1972, the total cost would have been approximately $84,000, of which $35,000 is definitely not attributable to Agnes. Of the remaining $49,000, which involves mostly repairs to the Patapsco River bridge, a substantial portion is not attributable to Agnes, but rather to B & A's failure to perform routine maintenance over the years. At 1975 prices, the total cost of restoring service is approximately $162,000, of which $66,000 is definitely not attributable to Agnes. Of the remaining $96,000, a substantial portion is again attributable to B & A's deferred maintenance policy concerning the Patapsco River bridge.

D. *Length of time within which repairs could be completed.*

Once the repair work is begun, the testimony was generally agreed that it would take two to three months for completion. However, there was little testimony as to when a contractor could be hired to begin work. Alco's expert, in accordance with his customary practice, would not recommend a contractor. Hence, the only evidence presented as to availability of contractors was that of defendants' track expert, Rhinehart Railroad Construction, Inc., which indicated that Rhinehart would not be available to begin repairs until September 1, 1975. Accordingly, this court finds that repairs would not likely be completed earlier than December 1, 1975.

E. *Interests of Anne Arundel County and the Mass Transit Administration of the Maryland Department of Transportation.*[1]

During the hearing on the permanent injunction, defendants presented the testimony of a senior planner for the Planning and Zoning Office of Anne Arundel County. The segment of B & A in question in this case lies within that county's border. The county does not feel that B & A is an essential transportation facility, and it is not presently encouraging the establishment along the B & A line of light industry that requires rail service for efficient operation.

The defendants also presented the testimony of the Director of Planning in the Rapid Transit Development Division of the Mass Transit Administration (MTA), Maryland Department of Transportation. The MTA has a plan to acquire the B & A right-of-way and use it for a passenger rail rapid transit system. Accordingly, the MTA has petitioned to intervene in the B & A abandonment proceedings before the ICC. The rapid transit system, however, is still in the planning stage, and no final plan has yet been formally adopted. It is clear that acquisition would not occur in the near future. Further, if B & A's abandonment application were denied, the MTA would revise its plan to include rail freight service.

F. *Facts relevant to "abandonment" and B & A's intention to abandon.*

It is undisputed that the initial cessation of service in June of 1972 was brought about by a condition over which defendants had no control: Hurricane Agnes. B & A therefore quite reasonably issued a temporary embargo of all rail service south of the Patapsco River. By September of 1972, the flood waters had subsided, and it was then physically possible to repair the damage and restore service.

B & A clearly has the present financial ability to make the repairs necessary to restore service without recourse to outside financing. However, B & A claims a net loss in its railroad operations of $68,000 over the 10-year period preceding its cessation of service to the Alco plant in 1972. B & A's sound financial position has therefore not resulted from the profitability of its rail operations in recent years. The President of B & A feels that B & A's rail service is a "losing proposition," and therefore, as a stock company, B & A does not wish to expend the funds necessary to repair and restore service in an operation that would be unprofitable. Indeed, it has never considered using its own funds to restore service. In addition, B & A has sold portions of its right of way near Annapolis to the State of Maryland, and hopes in the future to sell the remainder to the MTA.

Other than the unfruitful loan negotiations with Alco, B & A has never attempted to obtain outside financial assistance to undertake the repairs and restore rail service to Alco, despite its apparent eligibility to apply for a loan under the Emergency Rail Facilities Restoration Act, Pub.L.No. 92–591, 86 Stat. 1304 (1972).[2]

B & A also has a history of *de facto* abandonments without prior approval from the ICC. In 1968, B & A discontinued service south of the Severn River because the timber trestle bridge over the river was found to be unsafe. In 1969, B & A discontinued service south of the Alco plant due to a wash-

---

1. Plaintiffs objected to the admission at this proceeding of the testimony of officials from the MTA and Anne Arundel County claiming it to be irrelevant. The court heard the testimony and reserved ruling on its admissibility. The testimony is hereby admitted.

2. Funding for the Act was appropriated on July 1, 1973. Act of July 1, 1973, tit. I, ch. XI, Pub.L.No. 93–50, 87 Stat. 99. The imminence of this funding was called to B & A's attention by counsel for Alco by letter of June 7, 1973. Plaintiffs' Exhibit 9. B & A has never applied for assistance under the Act.

out at Marley Creek. While the lack of requests for rail service over the abandoned segments may justify the failure to make expenditures to restore service, B & A nevertherless filed no requests with the ICC for permission to abandon until January of 1973, that petition being in large part a response to the filing of an ICC complaint by Alco.

In summary, B & A has long considered its rail operations as a burden, and internal discussions as to the possibility of abandonment were held both before and after Agnes. B & A has long wanted to get out of the rail freight business, and Agnes provided it with a convenient excuse for doing so. B & A has no intention to resume service pending the outcome of its abandonment petition.

*Conclusions of Law*

This action arises under Sections 1(18) and 1(20) of the Interstate Commerce Act, 49 U.S.C. §§ 1(18), 1(20) (1970). Jurisdiction of this court is properly grounded upon 28 U.S.C. §§ 1337, 1345 (1970), and 49 U.S.C. § 1(20) (1970).

■ Section 1(18) of the Interstate Commerce Act states, in relevant part:

. . . [N]o carrier by railroad subject to this part shall abandon all or any portion of a line of railroad, or the operation thereof, unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment.

Section 1(20) further provides:

. . . Any . . . abandonment contrary to the provisions of this paragraph or of paragraph (18) or (19) of this section may be enjoined by any court of competent jurisdiction at the suit of . . . the Commission, . . . or any party in interest . . .

Both the ICC and Alco are authorized to institute suits under section 1(20) without prior resort to ICC ad-ministrative hearings. *I.C.C. v. Chicago, Rock Island & Pac. R. R.,* 501 F.2d 908, 912 (8th Cir. 1974), *cert. denied,* 420 U.S. 972, 95 S.Ct. 1393, 43 L.Ed.2d 652 (1975); *see Powell v. United States,* 300 U.S. 276 (1937); *Meyers v. Jay Street Connecting R. R.,* 259 F.2d 532 (2d Cir. 1958); *Myers v. Arkansas & O. Ry.,* 185 F.Supp. 36 (W.D.Ark. 1960). The doctrine of primary jurisdiction does not apply. *I.C.C. v. Chicago, Rock Island & Pac. R. R., supra* at 913–14; *I.C.C. v. Maine Cent. R. R.,* 505 F.2d 590, 594 (2d Cir. 1974).

It is clear from the Act that no carrier may abandon its operations on all or part of its railroad unless and until the ICC grants a certificate permitting abandonment. 49 U.S.C. § 1(18) (1970). No such certificate has yet been granted to B & A. However, the issue in this proceeding for a permanent injunction under sections 1(18) and 1(20) of the Act is not whether the abandonment should be granted or denied, for that question is for the ICC to decide subject to judicial review. *I.C.C. v. Chicago, Rock Island & Pac. R. R.,* 501 F.2d 908, 913 (8th Cir. 1974). Rather, the questions for resolution here are (1) whether an "abandonment" has occurred within the meaning of 49 U.S.C. § 1(18), and (2) whether, considering a myriad of equitable factors, an injunction compelling B & A to restore service should issue. *Id.* at 913–14. Simply stated, if there has been an abandonment, then the court, in its discretion, may issue an injunction restraining such abandonment.

*A. Abandonment.*

■ "Abandonment" is defined as a permanent or indefinite cessation of rail service. *Meyers v. Jay Street Connecting R. R.,* 259 F.2d 532, 535 (2d Cir. 1958); *I.C.C. v. Chicago, Rock Island & Pac. R. R.,* 501 F.2d 908, 911 (8th Cir. 1974). For purposes of sections 1(18) and 1(20), there is no conceptual distinction between discontinuing service permanently and suspending it indefinitely. *Meyers v. Jay Street Con-*

necting R. R., *supra* at 535; *I.C.C. v. Maine Cent. R. R.*, 505 F.2d 590, 593 (2d Cir. 1974). However, if the cessation of operations began and continues because of conditions over which the railroad had no control, no abandonment within the meaning of 49 U.S.C. § 1(18) would be established. *I.C.C. v. Chicago, Rock Island & Pac. R. R., supra* at 911; *Zirn v. Hanover Bank*, 215 F.2d 63, 69 (2d Cir. 1954); *Myers v. Arkansas & O. Ry.*, 185 F.Supp. 36, 41 (W. D.Ark.1960); *City of Alexandria v. Chicago, Rock Island & Pac. R. R.*, 311 F.2d 7, 10 (5th Cir. 1962).

▮ Abandonment should be distinguished from the term "embargo," which is issued by the carrier alone and which will justify a cessation of service as a temporary emergency measure when for some reason the carrier is unable to perform its duty as a common carrier. *I.C.C. v. Chicago, Rock Island & Pac. R. R., supra* at 911; *I.C.C. v. Maine Cent. R. R., supra* at 593; 49 C.F.R. § 1006.1 (1974). Because both abandonment and embargo entail a cessation of service, the question of whether an embargo has been transmuted into an unlawful abandonment revolves largely around the length of the cessation and intent of the railroad. *I.C.C. v. Chicago, Rock Island & Pac. R. R., supra* at 911; *I.C.C. v. Maine Cent. R. R., supra* at 593. *See also Williams v. Atlantic Coast Line R. R.*, 17 F.2d 17, 22 (4th Cir. 1927). Here the cessation has continued for nearly three years, certainly long enough to be an "abandonment" within the meaning of the Act. *See Meyers v. Jay Street Connecting R. R.*, 259 F.2d 532 (2d Cir. 1958); *I.C.C. v. Maine Cent. R. R.*, Civil No. 74–81 (D.Vt., July 18, 1974),

*aff'd*, 505 F.2d 590 (2d Cir. 1974). The question is therefore whether B & A has an intent to cease service permanently or indefinitely. This court finds that B & A indeed has such an intent, as evidenced by the following: (1) B & A has the financial ability internally to make the necessary repairs; (2) B & A has never sought outside public or private assistance to finance the repairs; (3) B & A has never even considered using its own funds; (4) B & A has sold off portions of its right of way and hopes to sell off more in the future; (5) B & A has long wanted to rid itself of its railroad operations; (6) B & A has a history of *de facto* abandonments without prior ICC approval; (7) B & A has no intention to resume service pending the outcome of its abandonment petition before the ICC; (8) a substantial portion of the required repair expenditures result from B & A's failure to expend funds for routine maintenance over the years. These facts amply support a finding that B & A intends to abandon its rail operations to Alco's plant. *See I.C.C. v. Maine Cent. R. R.*, 505 F.2d 590, 594 (2d Cir. 1974);[3] *I.C.C. v. St. Johnsburg & Lamoille County R. R.*, Civil No. 73–3 (D. Vt., Feb. 1, 1973); *Pennsylvania v. Penn Cent. Transp. Co.*, 348 F.Supp. 28, 30 (M.D.Pa.1972).

▮ B & A, however, contends that the cessation of operation cannot be deemed an unlawful abandonment because it was due to circumstances entirely beyond the control of the railroad, i. e., the occurrence of Hurricane Agnes. It is true that the initial cessation of service was beyond B & A's control because of the physical impossibility of rail operations. Hence, no in-

---

3. The lower court decision in *Maine Central*, which was affirmed in the Second Circuit case, stated:

The extremely lengthy period of discontinuation of service in this case [one year], extending well beyond any reasonable time required to repair the flood damage, coupled with the clear financial and physical ability of the Railroad to repair the damage and

resume service must, in our view be construed as an illegal abandonment capable of injunction under 49 U.S.C. § 1(20).

*I. C. C. v. Maine Cent. R. R.*, Civil No. 74–81 at 12 (D.Vt., July 18, 1974), *aff'd*, 505 F. 2d 590 (2d Cir. 1974). With respect to the question of abandonment, B & A's position is virtually identical.

tent to abandon could be inferred from the initial cessation. However, in order to avoid a finding of abandonment, the cessation must continue to be beyond the control of the railroad. *I.C.C. v. Chicago, Rock Island & Pac. R. R.*, 501 F. 2d 908, 911 (8th Cir. 1974). Hence, once the physical impossibility of service terminates, the cessation of service is no longer "beyond the control" of the railroad, at least where the railroad is financially able to repair the damage. *I.C.C. v. Maine Cent. R. R.*, Civil No. 74–81, at 13 (D.Vt., July 18, 1974), *aff'd* 505 F. 2d 590 (2d Cir. 1974); *Pennsylvania v. Penn Cent. Transp. Co.*, 348 F.Supp. 28, 30 (M.D.Pa.1972). Similarly, if the unsafe track conditions have resulted in large part from the railroad's policy of deferred maintenance, the cessation is not deemed "beyond the control" of the railroad. *See I.C.C. v. Chicago, Rock Island & Pac. R.R.*, 501 F.2d 908, 911–13 (8th Cir. 1974); *I.C.C. v. Chicago, Rock Island, & Pac. R.R.*, Civil No. CV 73–L–244 (D.Neb., Oct. 31, 1974) (on remand from Eighth Circuit). In this case, it is physically possible to restore service, and B & A has the financial ability to do so. In addition, virtually the entire cost of repairing the track to safe conditions is a result of B & A's longstanding policy of "deferred maintenance." As stated previously with respect to the bridge, it is certainly likely that much of the damage wreaked by Agnes would not have occurred had B & A performed routine maintenance on the bridge over the years. Hence, the current cessation of service cannot be deemed beyond B & A's control. *Myers v. Arkansas & O. Ry.*, 185 F.Supp. 36 (W.D.Ark.1960), is clearly distinguishable from B & A's position, for there the railroad had no right to expend money to repair the bridges and portions of the track, since part of the right of way in question had been condemned by the United States. In addition, there was no evidence that

the railroad was financially able to make the necessary repairs. 185 F.Supp. at 42.

■ B & A also contends that since the power to nullify an embargo and determine its reasonableness lies only with the ICC, and since the ICC has not seen fit to do so, the embargo is still valid, and therefore the cessation of service cannot be held to be an unlawful abandonment under section 1(18). Other than being a back-door method of invoking the doctrine of primary jurisdiction, which this and other courts reject in cases such as this,[4] B & A's contention in this regard is without merit. If a court finds that an initially valid, self-imposed embargo has over time become an adandonment within the meaning of 49 U.S.C. § 1(18), the mere fact that the embargo is still in effect and unchallenged by the ICC does not render an otherwise unlawful abandonment lawful. The courts have therefore not hesitated to find unlawful abandonments when unchallenged embargoes were still in effect. *See, e.g., I.C.C. v. Maine Cent. R.R.*, 505 F.2d 590 (2d Cir. 1794); *Meyers v. Jay Street Connecting R.R.*, 259 F.2d 532 (2d Cir. 1958).

This court concludes that B & A's failure to restore rail freight service to Alco's plant constitutes an unlawful abandonment within the meaning of Section 1(18) of the Interstate Commerce Act, 49 U.S.C. § 1(18) (1970).

B. *Whether an injunction should issue.*

■ Plaintiffs contend that once an unlawful abandonment is found, the plaintiffs have an absolute right to a permanent injunction, i.e., the district court has no discretion to deny the injunction based on equitable principles. The short answer to this contention is that the statute itself mandates no such result. Section 1(20) provides that "[a]ny construction, operation, or abandonment contrary to the provisions of

4. *I. C. C. v. Chicago, Rock Island & Pac. R. R.*, 501 F.2d 908, 913–14 (8th Cir. 1974), *cert. denied*, 420 U.S. 972, 95 S.Ct. 1393, 43 L.Ed. 2d 652 (1975); *I. C. C. v. Maine Cent. R. R.*, 505 F.2d 590, 594 (2d Cir. 1974).

464

this paragraph or of paragraph (18) or (19) of this section *may* be enjoined . . . ." 49 U.S.C. § 1(20) (1970) (emphasis added). The use of the term "may" clearly contemplates the excercise of discretion by the district courts. *I.C. C. v. Chicago, Rock Island & Pac. R.R.,* 501 F.2d 908, 914 (8th Cir. 1974).

Alco and the ICC principally rely on the Supreme Court's language in *Texas & Pac. Ry. v. Gulf, C. & S. F. Ry.,* 270 U.S. 266, 46 S.Ct. 263, 70 L.Ed. 578 (1926). In that case, the railroad attempted an extension of its tracks—rather than abandonment—without authorization from the ICC, and the Court held that since "no certificate [had] been obtained, the party in interest opposing construction is entitled as of right to an injunction." 270 U.S. at 273, 46 S.Ct. at 264. The question of a physical impossibility of operation without a substantial expenditure of funds, however, was not present in the *Texas* case. There is a clear distinction between enjoining the expenditure of funds for an extension of operations on the one hand and mandating the expenditure of substantial funds to resume operations on the other. In cases where a court is confronted with a physical impossibility of operation without substantial expenditures for repair, the determination as to whether an injunction should issue should be viewed as one of equity, i.e., "whether it would be equitable to require substantial expenditures when shortly thereafter the Commission may approve the railroad's abandonment application." *I.C. C. v. Chicago, Rock Island & Pac. R.R.,* 501 F.2d 908, 914 (8th Cir. 1974). Hence, neither Alco nor the ICC is entitled as of right to an injunction against B & A's unlawful abandonment. The injunction will be issued only if it is equitable to do so under the circumstances. *Id.*; *Pennsylvania v. Penn Cent. Transp. Co.,* 348 F.Supp. 28, 30 (M.D.Pa.1972); *Asbury v. Chesapeake & O. Ry.,* 264 F.Supp. 437, 438 (D.D.C. 1967); see *I.C.C. v. Maine Cent. R.R.,* 505 F.2d 590, 594 (2d Cir. 1974).

In balancing the equities in cases similar to this, other courts have considered a wide variety of equitable factors, including the relative cost of restoration of service; the progress of the railroad's abandonment application and whether it is likely to be successful; the financial resources of the railroad; the reliance of shippers on rail service and the hardship involved in cessation of that service; the assistance in financing the restoration of service offered by the plaintiff; the extent of responsibility of the railroad for the condition of disrepair; and the public interest generally. See *I.C.C. v. Chicago, Rock Island & Pac. R.R.,* 501 F.2d 908 (8th Cir. 1974); *I.C.C. v. Maine Cent. R.R.,* Civil No. 74–81 (D.Vt., July 18, 1974), *aff'd,* 505 F.2d 590 (2d Cir. 1974); *I.C. C. v. St. Johnsbury & Lamoille County R.R.,* Civil No. 73–3 (D.Vt., Feb. 1, 1973); *Pennsylvania v. Penn Cent. Transp. Co.,* 348 F.Supp. (M.D.Pa.1972); *Asbury v. Chesapeake & O. Ry.,* 264 F. Supp. 437 (D.D.C.1967).

After consideration of these and other factors, this court believes that the equitable factors balance in favor of granting an injunction enjoining B & A's unlawful abandonment.

First, because of the importance of uninterrupted rail transportation service in the nation's economy, Congress has expressed a clear intent, even to the point of criminal sanctions, that abandonments without prior ICC approval are not tolerated. See 49 U.S.C. § 1(20) (1970). B & A has long had an intention to get out of the railroad business, and, indeed, it abandoned approximately two-thirds of its line even prior to the occurrence of Hurricane Agnes in 1972. B & A filed no abandonment application with the ICC until 1973, and that filing was largely only a response to the filing of a complaint with the ICC by Alco. B & A's violation of the statute combined with the strong Congressional purpose to forbid such violations necessarily weighs most heavily against the equitable position of defendants.

Second, as to the costs to repair the railroad and restore service to Alco, the estimated cost of $162,000 at 1975 prices is certainly a valid equitable factor that tends to favor defendants' position. However, B & A cannot receive equitable advantage of inflationary factors that are included within that figure when it was possible to make the necessary repairs in 1972 at an estimated cost of $84,000. Moreover, the latter figure must be reduced by $35,000 in non-bridge damage attributable to B & A's own pre-1972 deferred maintenance policy. In addition, a substantial but indeterminable portion of the remaining $49,000 cost to repair the Patapsco River bridge is also the result of B & A's deferred maintenance policy. Hence, the cost figure to weigh most heavily on B & A's equitable side is reduced to something less than $49,000. It should again be noted in this regard that in 1972 B & A had, and it presently has, the financial ability to make the necessary repairs. Further, B & A admits that it never even considered using its own funds, or funds publicly available, to do so.

Third, B & A's unlawful cessation of service has placed Alco in an untenable position. Alco's plant, having a value of over ten million dollars, was expressly designed for rail intake of raw paper materials. While the plant has remained a growing and profitable operation, the increased costs since cessation of rail service have been substantial and will continue to be so. The additional costs clearly place Alco at a competitve disadvantage as compared to what its position would have been had B & A not unlawfully ceased operations. Under these circumstances, Alco has suffered and continues to suffer irreparable harm.

Fourth, the delay in contesting B & A's actions before this court probably weighs most heavily against the ICC. The ICC ignored previous pre-1972 abandonments of the B & A line and ignored the 1972 abandonment until August of 1974, at which time it brought the present action,

apparently at the urging of the ICC's own administrative law judge. Alco did pursue its complaint with the ICC almost immediately after it attempted negotiations with B & A for resumption of service in September of 1972. This remedy has proven unfruitful at the Commission level, and for some reason it has not sought judicial review. Either plaintiff could have brought the present action in September 1972, at which time a quick decision could have avoided the additional costs accruing since. Moreover, B & A did make an offer to restore service upon Alco's providing a loan in addition to various guarantees as to continued use of the rail service by Alco. While Alco may have reasonably felt the offer to be unacceptable, it made no reasonable counteroffer and filed a complaint with the ICC without prior notice to B & A. Nevertheless, even though Alco's failure to put up $50,000 in 1972 to aid in restoring service immediately cannot weigh in Alco's favor, B & A cannot equitably be heard to complain that its customer refused to advance the funds necessary to aid in doing that which B & A was otherwise legally bound to do, i.e., cease its unlawful abandonment.

Fifth, as stated in this court's previous opinion, the ICC delay in the processing of B & A's abandonment application caused by ICC's own actions in response to the decision in *Harlem Valley Transp. Ass'n v. Stafford,* 360 F. Supp. 1057 (S. D.N.Y. 1973), *aff'd,* 500 F.2d 328 (2d Cir. 1974), substantially undermines the equitable position of the ICC as a plaintiff in this case. This court is naturally reluctant to order substantial expenditures on the B & A line when there is a possibility that ICC would authorize abandonment, even though a final decision may not be forthcoming for a year or more. On the other hand, the only indication in this case as to the outcome of B & A's abandonment petition before the ICC was given by the ICC administrative law judge, who, in ruling on Alco's complaint, stated that the circumstances surrounding B & A's current po-

sition could never qualify for abandonment. Moreover, the ICC delay in ruling on the B & A abandonment cannot be attributed in any manner to fault on the part of Alco. Finally, B & A may have avoided much of the administrative delay, as well as the possibility of unnecessary expenditures for repair, had it petitioned for abandonment when it ceased operations. B & A would then have been either granted abandonment or ordered to continue service, and this proceeding would have been, in all probability, unnecessary.

Sixth, as to considerations of the public interest in the grant or denial of a permanent injunction, it is clear that Alco is presently B & A's only substantial prospective customer south of the Patapsco River. This court has also considered the interests expressed by the MTA and Anne Arundel County in this case. These interests, however, weigh only slightly, if at all, in favor of B & A's position. The plans of the MTA are very tentative and depend to a large extent upon the outcome of B & A's abandonment application. The position of Anne Arundel County as presented in testimony before this court appears to be merely one of indifference as to the continued existence of rail freight service on the B & A line.

After consideration of the law, the evidence, and the balance of the equities, and giving greatest weight to the first three factors enumerated above, this court concludes that a permanent injunction should issue requiring B & A to restore rail freight service to Alco's Glen Burnie plant. Counsel for ICC and Alco shall submit, after consultation with counsel for B & A, an appropriate order in accordance with this opinion. Defendants' motion to dismiss or stay these proceedings until a decision on B & A's petition for abandonment now pending before the ICC will accordingly be denied.

### Alco's Claim for Damages

In its complaint filed with the ICC contesting B & A's cessation of service, Alco also sought damages pursuant to 49 U.S.C. §§ 8, 9, 16(1) (1970), based upon alleged violations of 49 U.S.C. §§ 1(4), 1(11), 1(18) (1970). As previously noted, the administrative judge found that B & A had violated sections 1(4) and 1(18), but that Alco had failed to establish a prima facie case with respect to section 1(11). The judge ruled that the ICC had no jurisdiction to enforce section 1(18), but he did order B & A to cancel its temporary embargo and restore service to Alco, finding jurisdiction for such action under section 1(4). The judge declined to award damages, stating no reason for his ruling in that regard. The Commission affirmed the findings concerning sections 1(11) and 1(18), but reversed the administrative judge's ruling that the ICC had jurisdiction to enforce section 1(4), therefore stating that it did not reach the question of damages. The complaint was ordered dismissed. Alco has not sought judicial review of that decision. Instead, it now seeks damages in this court based upon common law principles and upon sections 1(4) and 1(11) of the Interstate Commerce Act, 49 U.S.C. §§ 1(4), 1(11). Alco does not seek damages for any alleged violations of section 1(18).

In a motion to dismiss Alco's claim for damages, B & A contends that Alco is barred from suing in federal court on its claims under sections 1(4) and 1(11) because it has made an election of remedies under 49 U.S.C. § 9 (1970) by proceeding initially before the Commission. Neither party having requested a hearing on the motion to dismiss, the issues will be decided upon consideration of the memoranda presented without oral argument, in accordance with Local Rule 6. For the reasons stated below, B & A's motion to dismiss Alco's claim for damages will be granted.

The Interstate Commerce Act and the common law impose duties upon the railroad to provide and furnish transportation upon reasonable request

therefor and to furnish safe and adequate car service.[5] Under neither the statute nor the common law is the duty to provide transportation and car service absolute.[6] The carrier has a right to issue a temporary embargo in times of emergency,[7] and a validly imposed embargo may therefore be a defense to a damage action under the statute or the common law for failure to provide transportation or car service upon reasonable request.[8] But while the railroad's duty can be qualified or excused by the existence of a valid embargo, the railroad will nevertheless become liable for damages subsequent to the time at which the embargo's validity ceases. *See Chicago & N.W. Ry. v. Union Packing Co.*, 373 F.Supp. 734, 737 (D.Neb.1974); 49 C.F.R. § 1006.4 (1974). *But see Asbury v. Chesapeake & O. Ry.*, 314 F.Supp. 310 (D.D.C. 1970).

▮▮▮ The plaintiff's statutory right to damages for the railroad's violation of its duties under the Interstate Commerce Act is established by 49 U.S.C. § 8 (1970). A consignee, as Alco appears to be in this case, is permitted to recover under section 8 if he has been injured by a railroad's violation of the Act. *Adams v. Mills*, 286 U.S. 397, 406-08, 52 S.Ct. 589, 76 L.Ed. 1184 (1932). However, section 9 of the Act requires the plaintiff to elect his method of pursuing his claim before either the ICC or a district court, but not both. 49 U.S.C. § 9 (1970).

▮▮▮ If the plaintiff elects to proceed initially before the ICC under 49 U.S.C. §§ 9, 13(1), 16(1) (1970), an award of damages is enforceable by a subsequent action in district court before a single district judge. 49 U.S.C. § 16(2) (1970); 28 U.S.C.A. § 1336(a) (Supp. Feb. 1975); *I.C.C. v. Atlantic Coast Line R.R.*, 383 U.S. 576, 585, 86 S.Ct. 1000, 16 L.Ed. 109 (1966). If damages are denied by the Commission or if the plaintiff wishes to challenge the adequacy of any damage award, judicial review is authorized by section 17(9), and the district courts have jurisdiction of the review proceeding under 28 U.S.C. § 1336 (1970).[9] *I.C.C. v. Atlantic Coast Line R.R.*, *supra*, 383 U.S. at 587, 86 S. Ct. 1000.

▮▮▮ The plaintiff's initial option to recover his damages in district court rather before the Commission has been somewhat limited by the development and application of the doctrine of primary jurisdiction,[10] especially in cases where a question concerning the validity or reasonableness of a carrier's embargo is involved.[11] The primary jurisdiction

5. *See* 49 U.S.C. §§ 1(4), 1(11), 22 (1970); *Johnson v. Chicago, M., St. P. & Pac. R. R.*, 400 F.2d 968, 971 (9th Cir. 1968); *Froehling Supply Co. v. United States*, 194 F.2d 637 (7th Cir. 1952); *See generally Montgomery Ward & Co. v. Northern Pac. Term. Co.*, 128 F.Supp. 475 (D.Or.1953).

6. *Brotherhood of Railway Clerks v. Florida E. Coast Ry.*, 384 U.S. 238, 245, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966); *Pacific Gamble Robinson Co. v. Minneapolis & St. L. Ry.*, 105 F.Supp. 794, 799 (D.Minn.1952), *aff'd in part and vacated as to damages*, 215 F.2d 126 (8th Cir. 1954).

7. *Chicago & N. W. Ry. v. Union Packing Co.*, 373 F.Supp. 734, 737 (D.Neb.1974); *New York Cent. R. R. v. United States*, 201 F. Supp. 958, 959 (S.D.N.Y.), *vacated as moot*, 371 U.S. 805, 83 S.Ct. 19, 9 L.Ed.2d 51 (1962); *see* 49 C.F.R. § 1006.1 (1974).

8. *Eastern Ry. v. Littlefield*, 237 U.S. 140, 144-45, 35 S.Ct. 489, 59 L.Ed. 878 (1915);

*Chicago & N. W. Ry. v. Union Packing Co.*, *supra* at 737.

9. This judicial review procedure has been altered by the Act of Jan. 2, 1975, Pub.L. No. 93-584, 88 Stat. 1917, *amending* 28 U.S.C. §§ 1336, 1398, 2323-25, 2341-42 (1970). Under this Act, the courts of appeals now have exclusive jurisdiction to enjoin, set aside, suspend, or determine the validity of all orders of the ICC other than for the payment of money. *See* 28 U.S.C.A. §§ 1336(a), 2321 (a), 2342(5) (Supp.Feb.1975). The Act does not apply to actions commenced on or before March 31, 1975.

10. *United States v. I. C. C.*, 337 U.S. 426, 439, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949). *See generally* 3 K. Davis, *Administrative Law Treatise* § 19.02 (1957).

11. *Chicago & N. W. Ry. v. Union Packing Co.*, 373 F.Supp. 734, 737 (D.Neb.1974); *Asbury v. Chesapeake & O. Ry.*, 314 F.Supp. 310 (D.D.C.1970); *Holt Motor Co. v. Nichol-*

doctrine applies whenever enforcement of a claim, originally cognizable in the courts, requires the resolution of issues that have been placed within the special competence of an administrative body in accordance with the purposes of a regulatory scheme. *United States v. Western Pac. R.R.*, 352 U.S. 59, 65, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). Whether the purposes of the Interstate Commerce Act require that the ICC should first pass on a question depends on whether the question raises issues of transportation policy that should be considered by the Commission in the interests of uniformity and administrative expertise. *Id.* at 65, 77 S.Ct. 161. *See generally* 3 K. Davis, *Administrative Law Treatise* § 19.02 (1957) [hereinafter cited as K. Davis]; *Great N. Ry. v. Merchants' Elev. Co.*, 259 U.S. 285, 292, 42 S.Ct. 477, 66 L.Ed. 943 (1922).

██ Whenever the doctrine of primary jurisdiction requires that administrative questions be decided first by the ICC, the district court must refer[12] such questions to the Commission[13] even if the ICC has no power to award damages or otherwise grant the relief sought,[14] and even if plaintiff has also alleged a violation of the railroad's duties under the common law.[15] The question of whether the primary jurisdiction doctrine requires a referral in this case need not be decided, however, because this court believes that Alco, by initially seeking damages before the Commission, is no longer entitled to maintain another action for damages in this court.

██ It is clear that once a plaintiff's claim is denied on the merits before the ICC, such denial having become a final order, section 9 prohibits an action in district court on the same claim. *See United States v. I.C.C.*, 337 U.S. 426, 434, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949); 49 U.S.C. § 9 (1970). Here, the Commission held that Alco had failed to establish a prima facie case as to its claim under section 1(11)—clearly a decision on the merits. Hence, Alco has elected its remedy with the Commission, and the section 1(11) claim is therefore barred in this court. *See United States v. Kansas City S. Ry.*, 217 F.2d 763, 771 (8th Cir. 1954).

██ However, the Commission did not decide Alco's claim under section 1(4) on its merits, finding that it had no jurisdiction to do so. Hence, the question is whether Alco, having not appealed to test the correctness of the Commission's decision, has nevertheless elected its remedy within the meaning of section 9.

An examination of court decisions reveals that the question of the Commission's jurisdiction to award damages for a carrier's violation of its duty under 49 U.S.C. § 1(4) is unsettled, at least where the requested transportation equipment is already owned by the carrier.[16] If the Commission's ruling as to

---

son *Universal S. S. Co.*, 56 F.Supp. 585, 591–92 (D.Minn.1944); see *Pennsylvania R. R. v. Puritan Coal Mining Co.*, 237 U.S. 121, 133–34, 35 S.Ct. 484, 59 L.Ed. 867 (1915); *Eastern Ry. v. Littlefield*, 237 U.S. 140, 35 S.Ct. 489, 59 L.Ed. 878 (1915). *See also New York Cent. R. R. v. United States*, 201 F.Supp. 958, 959 (S.D.N.Y.), *vacated as moot*, 371 U.S. 805, 83 S.Ct. 19, 9 L.Ed.2d 51 (1962).

12. When a referral occurs, the court ordering the reference has exclusive jurisdiction of any civil action to review any ICC order arising out of the referral. 28 U.S.C. § 1336(b) (1970).

13. *I. C. C. v. Atlantic Coast Line R. R.*, 383 U.S. 576, 579–80, 86 S.Ct. 1000, 16 L.Ed.2d 109 (1966).

14. 3 K. Davis § 19.07, at 39–41; *Hewitt-Robins, Inc. v. Eastern Freight-Ways, Inc.*, 371 U.S. 84, 89, 83 S.Ct. 157, 9 L.Ed.2d 142 (1962); see *Thompson v. Texas Mexican Ry.*, 328 U.S. 134, 151, 66 S.Ct. 937, 90 L.Ed. 1132 (1946).

15. *See Midland Valley R. R. v. Barkley*, 276 U.S. 482, 48 S.Ct. 342, 72 L.Ed. 664 (1928); *Taylor County Sand Co. v. Seaboard Coast Line R. R.*, 446 F.2d 853, 855 (5th Cir. 1971).

16. *Compare I. C. C. v. Baltimore & A. R. R,.* 64 F.R.D. 337, 345 (D.Md.1974), *Asbury v. Chesapeake & O. Ry.*, 314 F.Supp. 310 (D.D.C.1970), *and New York Cent. R. R. v. United States*, 201 F.Supp. 958, 959 (S.D.N.Y.), *vacated as moot*, 371 U.S. 805, 83 S.Ct. 19, 9 L.Ed.2d 51 (1962), *with United States v. Pennsylvania R. R.*, 242 U.S. 208, 226–27,

its jurisdiction is incorrect, Alco clearly should have sought judicial review of the denial of damages, since a favorable ruling thereupon would have preserved Alco's administrative remedy. But since Alco has not appealed, the ineffectiveness of the remedy would be due to its own inaction. Hence, if the ICC does have jurisdiction to enforce section 1(4), Alco should be found to have made a binding election, because its chosen remedy would have been adequate had it pursued that choice to the fullest.

On the other hand, if an appeal had confirmed that the Commission is indeed without jurisdiction to award damages under section 1(4), the court might be more sympathetic to Alco's plea to assert its damage claim in court despite its contrary reading of the law, since it would seem that the pursuit of a nonexistent remedy could not constitute an election with the meaning of section 9. But Alco has foregone its opportunity to have the existence of its ICC remedy judicially determined through the established procedures for judicial review. This court believes that, in the face of unsettled law as to the availability of a remedy, the policy behind section 9 requires Alco to pursue its chosen course to the fullest extent before it will be found not to have made a binding election due to the inadequacy of the remedy it selected. For whatever reason, Alco decided not to pursue fully its initial choice. Alco therefore should not be allowed to begin again in another forum.

Equally important in this case, however, is the interest of the parties and of the public that litigation concerning a single set of circumstances should stop at some point.[17] Because the statutory duties imposed upon carrier by the Interstate Commerce Act are overlapping to a great extent, *see, e. g.,* 49 U.S.C. §§ 1(4), 1(6), 1(9), 1(11), 1(12), 1(18), 3(1), 6(1), 15(1) (1970), a particular set of facts could conceivably establish a violation of any number of them. Alco therefore could have invoked the ICC's reparations jurisdiction under section 16(1) by alleging B & A's violation of one or more other sections of the Act, for it is settled that the ICC, apart from section 1(4), has the power to determine the reasonableness or validity of an embargo.[18] Alco chose not to assert violations of other sections before the ICC but instead seeks damages under section 1(4) here. This court, in all probability, would be required to refer the matter back to the ICC for its primary jurisdiction determination as to the reasonableness of the embargo under another section of

37 S.Ct. 95, 61 L.Ed. 251 (1916) and *Duralite Co. v. Erie Lackawanna Ry.*, 339 I.C.C. 312, 314 (1971).

17. In addition to Alco's ICC complaint, two other proceedings on the same set of facts have been brought: this proceeding for damages and permanent injunctive relief, and B & A's abandonment application now pending before the ICC. All are subject to appellate review. Further, a full hearing was previously held by this court on ICC's motion for a preliminary injunction. Were this court to refer the current action to the ICC under the doctrine of primary jurisdiction, another hearing and administrative appeal would be held, again followed by judicial review. The application of the ICC's final order (assuming no reversal for further administrative proceedings) to this action would require further proceedings here, subject to appellate review. Hence, were this court not to dismiss Alco's claim, there could be a total of at least six plenary hearings, three administrative appellate proceedings, and nine separate judicial review proceedings (including possible Supreme Court review) all on the same set of facts.

18. *Asbury v. Chesapeake & O. Ry.*, 314 F. Supp. 310, 313 (D.D.C.1970); *New York Cent. R. R. v. United States, supra* at 959; *Baltimore Chamber of Commerce v. Baltimore & O. R. R.*, 45 I.C.C. 40, 51 (1917); *see Chicago & N. W. Ry. v. Union Packing Co., supra* at 737; 49 U.S.C. §§ 1(6), 13(2), 15 (1) (1970); *American Mfg. Co. v. Director General*, 77 I.C.C. 52 (1922); *cf. Holt Motor Co. v. Nicholson Universal S. S. Co., supra* at 591–92; *New Orleans v. Traffic & Transp. Bureau v. Mississippi Valley Barge Line Co.*, 280 I.C.C. 105 (1951). *See also United States v. Kansas City S. Ry.*, 217 F. 2d 763, 771 (8th Cir. 1954).

the Act. *Holt Motor Co. v. Nicholson Universal S. S. Co., supra* at 591–92; *see Chicago & N. W. Ry. v. Union Packing Co., supra* at 737. In effect, this would permit Alco to assert a second claim on the same set of facts in a second action before the Commission without having sought an appeal on the first. The logical extension of permitting this result would be to allow a plaintiff that has lost its case under one section to return to the ICC to seek relief upon the same set of facts under a second section, and, if the plaintiff loses again, to seek the same relief later under a third.[19]

Litigation must end somewhere. To allow a plaintiff to shuttle back and forth between the ICC and the courts asserting new claims each time would be not only inequitable to the defendant, but contrary to the purposes of section 9 of the Interstate Commerce Act. By requiring a plaintiff who brings an action under section 9 to assert *all* its claims in one action in the forum of its choice, the endless "renvoi" will never begin. In this case, Alco had the opportunity to assert all its claims before the Commission but chose not to do so. Hence, Alco has elected its damage remedy before the Commission within the meaning of section 9. Accordingly, its claim is barred in this court. 49 U.S.C. § 9 (1970). *See also United States v. I.C.C.*, 337 U.S. 426, 434, 69 S.Ct. 1410, 93 L.Ed. 1451 (1949); *Asbury v. Chesapeake & O. Ry.*, 314 F.Supp. 310, 313 (D.D.C.1970). The defendants' motion to dismiss Alco's damage claim will be granted.

An appropriate order will be entered separately.

## ORDER

For the reasons stated by this court in the Memorandum of even date, it is this 29th day of April 1975, by the United States District Court for the District of Maryland, ordered:

1. That the motions of defendants to dismiss or in the alternative to stay the action for permanent injunctive relief be, and the same hereby are, denied.

2. That the motion of defendants to dismiss the claim of plaintiff Alco-Gravure, Inc. for damages be, and the same hereby is, granted.

The Clerk shall mail a copy of this Order together with a copy of the Memorandum of even date to counsel for all parties.

## ORDER

For the reasons stated by this court in the Memorandum of April 29, 1975, it is this 12th day of May, 1975, by the United States District Court for the District of Maryland, ordered:

1. That the defendants are enjoined from further violation of 49 U.S.C. § 1(18) in regard to the abandonment of the operations of a line of railroad, that runs from Clifford Junction in Baltimore City to a point approximately six miles south, so that rail service can be restored to plaintiff Alco-Gravure, Inc. in Glen Burnie unless and until defendant, The Baltimore and Annapolis Railroad Company, has received a certificate of public convenience and necessity from the Interstate Commerce Commission authorizing such abandonment;

2. That defendants shall proceed forthwith to effect sufficient repairs necessary to restore, continue and sustain rail service to plaintiff Alco-Gravure, Inc. within Federal Railroad Administration Class 1 standards at speeds of ten miles per hour unless and until such certificate is obtained;

3. That not more than thirty days from the date of this Order defendants shall file with this court and serve upon plaintiffs a comprehensive plan for the work to be done to restore service including a time schedule for completion of the various phases of the work, an expected final completion date for all

19. And since the legal claims, theories, and issues may be different each time, strict principles of res judicata may not apply. *See* 2 K. Davis § 18.01–.02.

of the work, and the persons, firms or corporations engaged or to be engaged to perform the various phases of the work, and each two weeks thereafter shall file with the court and serve upon plaintiffs a report of the work completed together with any requests for revision of the plan earlier filed; that these reports will terminate upon restoration of service, but further action by this court will be predicated thereon if satisfactory progress is not timely made toward such restoration of service;

4. That defendants shall give due consideration in the selection of contractors for any or all of the work to persons, firms or corporations able to commence and complete the work without undue delay.