350

ANNE ARUNDEL COUNTY, MARYLAND v. THE
BALTIMORE AND ANNAPOLIS RAILROAD
COMPANY ET AL.

[No. 1488, September Term, 1979.]

*Decided July 15, 1980.*

The cause was argued before MELVIN and WILNER, JJ., and

J. Louis Boublitz, Associate Judge of the District Court of Maryland for District 11, specially assigned.

*John M. Court, Assistant County Solicitor,* with whom was *Richard Lazer Hillman, County Solicitor,* on the brief, for appellant.

*Joseph I. Huesman,* with whom were *Lerch & Huesman* on the brief, for appellee The Baltimore and Annapolis Railroad Company. *James P. Bennett,* with whom were *James A. Biddison, Jr.,* and *C. Fred Delavan* on the brief, for appellee Baltimore Gas and Electric Company.

Wilner, J., delivered the opinion of the Court.

As one might reasonably surmise from its corporate name, the Baltimore and Annapolis Railroad Company (B & A) once ran a railroad between Baltimore and Annapolis. It has not done so, however, since 1969 — not regularly, not at all. For at least four years, Anne Arundel County (the county), wherein most of the track is located, has been vainly seeking an authoritative determination from someone that the line has been abandoned in order that some more constructive use might be made of the right-of-way.[1] It has done, it thinks, all that it could do before the Interstate Commerce Commission (I.C.C.), and thus turned to the State courts for more complete relief. Believing that the matter still rested within the exclusive jurisdiction of the I.C.C., however, the Circuit Court for Anne Arundel County, by granting a motion raising preliminary jurisdiction under Maryland Rule 323 (a) (10), declined to entertain the county's Petition for Declaratory Judgment. The county has appealed.

## (1) *The County's Position*

The county's claim rests upon a reverter clause in the deed

---

1. This is but one of several unusual features of this case. The normal posture of an abandonment case has the railroad seeking abandonment and the affected political subdivision opposing it. As will become apparent, however, the dispute here is not over service, which does not exist, but over the valuable right-of-way which the railroad has and the county wants.

by which the B & A's predecessor in title received part of its right-of-way.[2] There were actually two deeds — one in 1888 and one in 1905 — but the latter, for all practical purposes, is the critical one. In that deed, the Curtis Creek Mining, Furnace and Manufacturing Company (Curtis Creek), a Maryland Corporation, granted the right-of-way in question to B & A's predecessor subject to the following proviso:

> "that if the land hereby conveyed shall ever be used for any other than legitimate railroad purposes or in case the said Railroad Company, its successors or assigns, shall at any time *cease active operation as a freight and passenger carrying railroad for the space of one year,* then the land hereby conveyed shall revert to the said party of the first part [*i.e.,* Curtis Creek], its successors or assigns. . . ."

The county's interest in this condition emanates from a quitclaim deed dated August 7, 1978, in which Francis C. Harwood, representing himself to be the sole surviving director of Curtis Creek, conveyed to the county "whatever right, title and interest grantor may have" in the 66-foot wide right-of-way in question. The county thus claims the right to "enforce" the reverter clause, and, by it, to assert the extinguishment of the right-of-way granted in that deed, its own title to the fee simple estate, and its right of exclusive possession of the land and "whatever railroad paraphernalia may remain" upon it.

The county's petition alleged, in relevant part, that (1) the 1888 and 1905 deeds conveyed "easements for railroad purposes only and become extinguished when railroad operations cease for the period of one (1) year over the property of the grantor," (2) after Hurricane Agnes in 1972, "all use of the aforesaid easement for railroad purposes ceased and has not been since resumed," and (3) B & A had challenged the existence and validity of the county's

---

**2.** The right-of-way in question here covers only a small part of the 21.4-mile line, the 1905 deed indicating an area of 1.2 acres.

asserted interest in the property. Upon this basis (supplemented by other averments), the county asked the court to declare that "use of the right of way" in question "has been terminated and abandoned," that the county, as successor in title to Curtis Creek, "now holds said fee under the right of way and is entitled to its exclusive possession" subject to certain rights of the Baltimore Gas and Electric Company,[3] and that the county "is entitled to possession of whatever railroad paraphernalia may remain in the said easement. . . ."

In dismissing this petition, the court concluded that to do otherwise would require it to decide whether the right-of-way had been "abandoned by the railroad," which would "infring[e] upon the jurisdiction of both the [I.C.C.] . . . and the Federal District Court." The court did allow the county, however, to file an amended action "raising the issue of whether the right of way has reverted to [the county]. . . ." The county, to date, has declined that invitation.

## (2) *The Issue*

The issue before us is clearly a jurisdictional one: did the circuit court have "subject matter" jurisdiction to entertain the county's petition and to declare what, if any, rights it has in the property. In this regard, there is no doubt as to the court's statutory jurisdiction to make a declaration of the county's rights or status under a deed. *See* Md. Ann. Code, Courts article, §§ 3-403, 3-406, 3-409. The question is whether that jurisdiction may be exercised in this case — whether it has been superseded, and thus suspended, by a conflicting and superior jurisdiction of the I.C.C.

Unfortunately, this question is not a simple one; it is made complex in part because of the intricate procedural background of this dispute, in part because the relevant Federal law has been twice amended during the course of the

3. The utility also has certain easements in the right-of-way for its transmission lines. Although made a party defendant, none of its rights or property appear to be in jeopardy by this proceeding.

various proceedings, and in part because the full scope of the Federal preemption with respect to the title questions raised in this case is not altogether clear.

### (3) *Procedural Background*

The procedural antecedents of this case began in or before January, 1973, with an application to the I.C.C. by one of B & A's customers (Alco-Gravure, Inc.) for an order requiring the railroad to restore service on the six-mile segment of its line running from Baltimore City to Glen Burnie. Service on that portion of the line had apparently ceased in 1972 as the result of flooding and other damage wrought by Hurricane Agnes. B & A responded, in part, with its own application of January 11, 1973, for authority to abandon operations over its entire 21.4-mile line, including, we presume, the right-of-way at issue in this case. In the course of the ensuing administrative proceedings on these two applications, which were consolidated by the I.C.C., a question arose as to whether B & A had, in fact, already abandoned operations on the line (or at least the six-mile segment of it) without I.C.C. approval, in violation of then 49 U.S.C. § 1(18).[4] The question was serious enough to cause the I.C.C. to commence an action against B & A in the U. S. District Court alleging that an illegal abandonment had occurred and seeking injunctive relief. *See* former 49 U.S.C. § 1(20).[5]

On April 29, 1975, while B & A's application for *permission* to abandon was still pending before the I.C.C., the U. S. District Court concluded that there had indeed been an unlawful abandonment within the meaning of § 1(18) of title 49. *See I.C.C. v. Baltimore and Annapolis*

---

4. That section then provided, in relevant part, that no railroad subject to I.C.C. jurisdiction "shall abandon all or *any portion of a line of railroad, or the operation thereof,* unless and until there shall first have been obtained from the Commission a certificate that the present or future public convenience and necessity permit of such abandonment." (Emphasis supplied.)

5. In relevant part, § 1(20) provided that any abandonment in violation of § 1(18) may be enjoined "by any court of competent jurisdiction" at the suit of the United States, the I.C.C., or any State regulatory commission.

*Railroad Company,* 398 F. Supp. 454 (D. Md. 1975). The Court specifically found not only a cessation of operations on the six-mile segment commencing from 1972 but also an intention on the railroad's part to cease service "permanently or indefinitely." *See* 398 F. Supp. at 462. Upon these findings, on May 12, 1975, the Court enjoined B & A from further violation of § 1 (18) "in regard to the abandonment of the operations of a line of railroad" — *i.e.,* the six-mile segment — until it "has received a certificate of public convenience and necessity from the Interstate Commerce Commission authorizing such abandonment. . . ." 398 F. Supp. at 470. These findings, and the order emanating from them, were affirmed on appeal. *See Interstate Commerce Commission v. Baltimore and Annapolis Railroad Company,* 537 F.2d 77 (4th Cir.), *cert. den.* 429 U.S. 859 (1976).

Following the Order of the District Court, B & A, on June 9, 1975, petitioned the I.C.C. to expedite proceedings on its abandonment application, contending that it would be wasteful to require it to expend vast sums to restore service over a six-mile segment of the line "when there is ripe for decision by this Commission the question of whether the present or future public convenience and necessity permit abandonment of operations over that line. . . ." On May 26, 1976, the Commission issued an order concluding that B & A had provided no service *south* of Glen Burnie (*i.e.,* covering the right-of-way in question here) since 1969. It stated, however:

> "*Because no application for authority to abandon the entire right-of-way and no agreement to amend the instant application to cover a line abandonment has been reached,* we cannot at this time approve an abandonment of the B&A right-of-way south of Glen Burnie. If at some time in the future such an application is filed we will incorporate the record herein, including the environmental impact statement, into that proceeding. Our present analysis of the limited record herein, without the

advantage of B&A's evidence on a line abandonment, indicates that an abandonment of the entire right-of-way between Glen Burnie and Annapolis has been justified." (Emphasis supplied.)

On October 1, 1976, the county, joined by the City of Annapolis, applied to the Commission for a certificate of convenience and necessity permitting that which the May 26 order declined to determine: abandonment of the 15.4-mile right-of-way between Glen Burnie and Annapolis. This was a quite different type of application from that which the B & A had filed; and it raised, for the first time, the real economic issue at stake here. The Interstate Commerce Act draws a rather clear distinction between the abandonment of *service* on a line and abandonment of the line itself. This was manifest in former § 1(18), and is equally clear from amendments enacted by Congress in 1976 and 1978.[6] The railroad was seeking only to discontinue operations over the line, not the right-of-way itself. It desired to keep the valuable right-of-way, but to be excused from the obligation of running trains over it. The county, on the other hand, recognizing that there will be no service, wants the right-of-way. This, as we have said, is the heart and soul of this case. B & A, quite naturally, opposed the county's application while pressing its own.

The county's application was docketed as part of the pending proceedings (Docket AB-71), and thus was treated

---

6. The relevant portions of § 1(18) are set out in footnote 4, *supra*. P.L. 94-210 (the Railroad Revitalization Act), effective February 5, 1976, repealed §§ 1(18) and 1(20) of title 49 and enacted in their place a new § 1a. Subsection (1) thereof stated that no railroad "shall abandon all or any portion of its lines of railroad (hereinafter in this section referred to as 'abandonment') and no such carrier shall discontinue the operation of all rail service over all or any portion of any such line (hereafter referred to as 'discontinuance'), unless such abandonment or discontinuance is described in and covered by a certificate" issued by the I.C.C. declaring that the present or future public convenience and necessity require or permit "such abandonment or discontinuance." P.L. 95-473, effective October 17, 1978, substantially rewrote the entire Interstate Commerce Act. Section 1a(1) now appears as § 10903(a): "A rail carrier [subject to I.C.C. jurisdiction] may (1) abandon any part of its railroad lines; or (2) discontinue the operation of all rail transportation over any part of its railroad lines; only if the Commission finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance."

under § 1(18) notwithstanding the enactment of § 1a in the interim. This was in accordance with a form of "grandfather" clause enacted as part of the 1976 law.[7] After considering the record in the consolidated proceeding and such additional evidence submitted by the parties, the Commission, by Report dated June 20, 1977, determined:

"The evidence of record is that *no operations have been conducted over this line of railroad since 1969.* Further, the Commission has found that the present and future public convenience and necessity permitted abandonment of operations by B&A over its line of railroad between Glen Burnie and Annapolis, Maryland. *Id,* at 43, and protestant has presented no evidenc [sic] as to wny [sic] abandonment of the line should not be permitted. We conclude, the[n], *that the evidenc [sic] of record is sufficient to show the abandonment of said line of railroad to be permitted by the present and future public convenience and necessity."* (Emphasis supplied.)

Under former 49 U.S.C. § 1(20), the Commission was authorized to "attach to the issuance of the certificate such terms and conditions as in its judgment the public convenience and necessity may require." [8] In that regard, the county, desiring to use the "abandoned" right-of-way as a recreational corridor for hiking, bicycling, and horseback riding, asked the Commission, as a condition of the certificate, to require B & A to negotiate exclusively with it with respect to the disposition of the right-of-way. This, the Commission declined to do, noting prophetically:

"In weighing whether or not to impose the requested

7. Section 1a(8), enacted as part of P.L. 94-210, provided that petitions for abandonment or discontinuance which were filed and pending before the Commission prior to the effective date of the Act or regulations of the I.C.C. required under it "shall be governed by the provisions of section 1 of this Act which were in effect on such date of enactment . . . ," with two exceptions not relevant here.

8. This authority to attach conditions to the abandonment was continued by the 1976 amendments in § 1a(4), and now appears in § 10903(b)(1).

conditions, the practical aspects of such conditions must be considered. *Conditions that are imposed on the certificate of abandonment must be complied with in order for the carrier to abandon the line of railroad. However, the authority granted in a certificate is merely permissive, not mandatory. Thus, if a carrier, in whose name a certificate is issued, does not wish to comply with the condition, it simply will not effect the abandonment.* Hence, were we to impose conditions on the certificate sought by applicants which B&A found distasteful, that carrier could refuse to abandon the line, frustrating the imposition of conditions on the certificate.

Although the conditions sought by applicants are for a valid public purpose, it is in the Commission's discretion to impose such conditions. We do not see how issuing a certificate of public convenience and necessity containing the conditions requested by applicants would achieve their purpose, since B&A opposition thereto raises the strong probability that it would simply fail to take any action under the permissive certificate. Therefore, we believe imposition of conditions on the certificate in this unusual factual situation would frustrate, rather than promote, the purposes of applicants and the Act." [9] (Emphasis supplied.)

The next relevant action occurred on February 21, 1978, when the Commission issued its "Second Corrected Certificate and Order" — this being, in effect, the certificate of convenience and necessity permitting abandonment of the 15.4-mile section of line. The Order implicitly required B &

---

**9.** The Commission, in its Report, and subsequent Order of June 20, 1977, did attach two other conditions no longer relevant here — one permitting postponement of the certificate if an "offer of financial assistance" to B & A was forthcoming and the other imposing certain "labor protections" set forth in § 405 of the Rail Passenger Service Act. *Compare* § 1a(10) as enacted by P.L. 94-210: "If the Commission finds that the properties proposed to be abandoned are suitable for other public purposes, it shall order that such properties not be sold, leased, exchanged, or otherwise disposed of except in accordance with such reasonable terms and conditions as are prescribed by the Commission. . . ."

A to cancel the tariffs applicable to the line as a condition of abandonment, and explicitly stated:

"(2) If the authority granted by this certificate and order is exercised, the railroad shall submit two copies of the journal entries showing the retirement of the line from service, and shall advise this Commission in writing, immediately after abandonment of the line of railroad, of the date on which the abandonment actually took place.

(3) If the authority granted in this certificate and order is not exercised within one year from its effective date, it shall be of no further force and effect."

B & A treated this order with silence and inaction. It did nothing with respect to canceling its tariffs and took no other action to consummate the abandonment. It did, however, on March 28, 1978, express in a letter to the State Secretary of Transportation, its desire and intent "to sell or otherwise dispose of the 15.4 miles of property over which said rail line is constructed, and the rights and easements appurtenant thereto." [10]

In December, 1978, the county returned to the I.C.C. with a petition to extend the efficacy of the previous order granting permission to abandon. It noted that there was then pending a condemnation action, and that the county needed more time to prosecute it. On February 23, 1979, the Commission extended the certificate for an additional year — until February 20, 1980; but, in doing so, it also stated:

"The Commission's original grant of authority to

---

10. This letter, written "under protest" was prompted by Md. Ann. Code, Transportation article, § 2-105. Subsection (a) thereof authorizes the Secretary of Transportation to acquire "any railroad corridor property over which transportation has been provided and abandonment has been approved by the [I.C.C.]." Subsection (b) provides that "[i]f a railroad company intends to sell or otherwise dispose of any railroad corridor property that is located in this State and for which the company has received permission from the [I.C.C.] ... to abandon transportation services, the company shall notify the Secretary of its intent to sell or otherwise dispose of the property."

abandon was permissive as is this extension of time to consummate. A failure by B&A to abandon will not be a violation of the certificate. The petitioners' request that we certify that any jurisdiction retained shall not interfere with the exercise of its power of eminent domain will be denied. *Until such time as the B&A elects to exercise the permissive authority to abandon, it remains subject to our authority, which we cannot waive."* (Emphasis supplied.)

The record before us does not indicate what, if anything, became of the condemnation action.[11] In May, 1979, the proceeding now before us was filed, and in November the county sought another extension from the I.C.C., which, on February 27, 1980, it received.[12]

### (4) *Was the Court Right in Granting B & A's Motion?*

As we earlier observed, the issue before us is a jurisdictional one. The court did not declare that the county was not entitled to the relief it sought; the court declined even to consider the question, believing that it had no power to adjudicate whether the right-of-way had been abandoned. We think it erred.

The court's principal error was in misconstruing the nature of the county's request. Given (1) the statutory

---

**11.** At oral argument, we were advised that the action, which involves other portions of the right-of-way (and not that at issue here), was still pending.

**12.** The lower court decided this case on December 20, 1979, before this last extension was granted (also before it became necessary). The I.C.C. decision again noted that the action was "permissive only" and that "the railroad can more or less ignore it because the railroad would not have to abandon the line based on the certificate." There was added, however, this additional comment: "However, a certificate allowing abandonment of the right-of-way is evidence in any court proceeding, that the line is not required."

The Commission chairman, in dissent, observed that B & A had in fact abandoned the line — at least the 15.4-mile segment from Glen Burnie to Annapolis — and that it "is simply trying to hide behind our jurisdiction in order to hinder and defeat the efforts of the civic parties to acquire its abandoned right-of-way under ordinary state-ordained procedures."

authority of the I.C.C. to impose conditions on an abandonment and to require satisfaction of those conditions as a prerequisite to a lawful abandonment, (2) the fact that the I.C.C. has, pursuant to that authority, actually imposed certain conditions on B & A's abandonment of the 15.4-mile segment which have not been satisfied, and (3) the Commission's clear and repeated expression of its continuing jurisdiction over the B & A until the conditions *it* established for abandonment have been satisfied, the court would clearly have had no authority to act in a contrary manner and declare that a portion of the line had, in fact and in law, been abandoned by B & A. That does not mean, of course, that the court was without jurisdiction, on these facts, to determine that it had *not* been abandoned.

But that is not what the county asked the court to do, at least not in its first prayer for relief. B & A emphasizes the distinction between discontinuance of service and abandonment of the line, a distinction, as we have noted, which is both valid and significant. That distinction applies equally to the petition at issue here.

The reverter clause sought to be enforced by the county does *not* require an abandonment of the line — only the cessation of "active operation as a freight and passenger carrying railroad for the space of one year." If the reverter is still viable — a point in sharp dispute — there is little question that its condition has been satisfied. The I.C.C. has so held, and B & A does not dispute the matter. The county's petition alleges that "all *use*" of the easement has ceased, and seeks, in its first prayer, a declaration that the "*use* of the right of way" has been terminated and abandoned. There is no allegation that the line itself has been abandoned, and we see no request for a declaration to that effect. In short, it would seem that the petition, *to that extent,* and as presently worded, does indeed raise the very issue that the court initimated that it *could* consider — "whether the right of way has reverted. . . ."

A declaration by the court as to the county's rights under the quitclaim deed, the viability and validity of the reverter clause, and ultimately the respective interests (if any) of

362

each party in the property, of itself, would serve neither (1) to eject B & A from the property (should the declaration be adverse to it), (2) to effect, cause, or constitute an abandonment of the line, nor (3) to infringe upon the jurisdiction of the I.C.C. or detract from the conditions it has established for a lawful line abandonment. We see no reason, therefore, why the first prayer sought by the county could not be considered and determined. Such a determination would do no more than adjudicate, as a matter of State law, what, if any, effect the undisputed cessation of railroad operations by B & A has on the title to the property in question. There is no lack of subject matter jurisdiction in that regard.[13]

The second and third prayers, however, raise a more difficult question, for they seek to exclude B & A from possession of the land and the railroad fixtures on it. Ordinarily, of course, such relief would naturally flow if the county were successful in establishing title to the fee and extinguishment through reversion of the right-of-way. Such an ejectment would be tantamount to a forced, involuntary, abandonment of that portion of the line itself, however, in that it would preclude B & A from ever again using the land for railroad purposes. That type of order or judgment *would* cross the line between discontinuance of operations and abandonment of the line itself. It would serve to effect a line abandonment without regard to or compliance with the I.C.C. conditions, and it would therefore be in derogation of the prevailing jurisdiction of that Federal agency. This, it would appear, the court is preempted from doing. *See Smith v. Hoboken R. W. & S. C. Co.,* 328 U.S. 123 (1946).

---

**13.** B & A argues that since the deed containing the reverter clause was granted after the enactment of the original Interstate Commerce Act, the reverter clause itself is subject to paramount Federal jurisdiction and may not be enforced for that reason. In support of this proposition, it cites *Whalen v. Balto. & Ohio R. Co.,* 108 Md. 11 (1908); *Schnepfe v. Consol. Gas Etc. Co.,* 164 Md. 630 (1933); and *Brehm v. State Roads Commn.,* 176 Md. 411 (1939). We do not view those cases as establishing any such proposition or as even being relevant. Neither Federal jurisdiction nor the Interstate Commerce Act were mentioned, much less at issue. To the extent the argument may have some validity, however, it relates only to the validity and enforceability of the reverter clause, a matter which the circuit court is competent to consider on the merits.

We cannot, of course, presume or predict what ruling the court might make as to the county's interest in the property or as to the validity or enforceability of the reverter clause. If the county loses that issue, the question of ejectment becomes moot. If the county prevails, it may (absent some further action by the I.C.C.) be unable to eject B & A, but it will have established its title and thus deprived B & A of any right to transfer that part of the right-of-way. The issue, in that event, would *not* be moot.

For the reasons stated above, we believe that the court erred in dismissing the petition outright under Maryland Rule 323 (a) (10).

> *Judgment reversed; case remanded to Circuit Court for Anne Arundel County for further proceedings; appellees to pay the costs.*